NATIONAL WILDLIFE FEDERATION,
Appellant,

v.

John W. SNOW, in his official capacity
as administrator, Federal Highway
Administration, et al.

No. 75–1214.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 21, 1976.

Decided Oct. 28, 1976.

228

Russell H. Carpenter, Jr., Washington, D. C., with whom Oliver A. Houck and Kenneth S. Kamlet, Washington, D. C., were on the brief for appellant.

Francis J. Mulcahy, Jr., Atty., Federal Highway Administration, Dept. of Transportation, Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry, Eric B. Marcy, Mary-Elizabeth Medaglia, Asst. U. S. Attys., and Stuart M. Gerson, Asst. U. S. Atty., Washington, D. C., at the time the brief was filed, were on the brief for appellees.

Before McGOWAN, LEVENTHAL and WILKEY, Circuit Judges.

Opinion for the Court by Circuit Judge LEVENTHAL.

Dissenting opinion by Circuit Judge WILKEY.

LEVENTHAL, Circuit Judge:

Appellant National Wildlife Federation brought this case to challenge two Federal Highway Administration regulations governing the number and timing of public hearings on federally assisted highways.[1] Appellant alleged that the regulations should have been promulgated in accordance with the notice and comment rulemaking requirements of the Administrative Procedure Act[2] (APA). The District Court

1. The regulations challenged are codified at 23 CFR §§ 790.5(g) and 790.9(f).

2. Notice and comment procedures are set out in 5 U.S.C. § 553(b)–(e) (1970). Typically an

held that the challenged regulations were exempt from those requirements. We affirm that ruling. Appellant also alleged that the regulation permitting advance acquisition of highway right of way parcels, without any public hearing on issues of location or any environmental impact statement, violated the public participation requirement of the Federal-Aid Highway Act,[3] the National Environmental Policy Act[4] (NEPA) and the Clean Air Act.[5] The District Court dismissed that count on the ground that it was not ripe for decision. We reverse that ruling and remand for the entry of appropriate relief.

## I.

The applicability of notice and comment requirements to promulgation of the regulations involved in this case turns on the scope of the exemption contained in 5 U.S.C. § 553(a). Subsection (a) provides that Section 553 applies:

except to the extent that there is involved—

(1) a military or foreign affairs function of the United States; or

(2) a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts.

The Federal Highway Administration (Administration) considered both of the regulations challenged in this appeal as relating to grants, and therefore within the § 553(a)(2) exemption from notice and comment rulemaking. The issue is one of first impression.[6]

The regulations at issue are in form procedural ones governing the timing and number of public hearings to be held before building a federal-aid highway. Section 128 of the Federal Aid Highway Act requires a state highway department to certify to the Federal Highway Administration (FHWA) that it has had or offered public hearings on a highway project, and that it has considered the "economic, social, environmental, and other effects of the plan or highway location or design and various alternatives which were raised during the hearing or which were otherwise considered."[7] The Administration, which ex-

---

agency will formulate a proposed regulation, then publish it in a notice in the Federal Register inviting comments from interested parties. After the agency has considered the comments, it either reformulates the regulation in light of the comments or adopts the proposed regulation as its final decision. Finally, the adopted rules are published along with a statement of their basis and purpose.

**3.** 23 U.S.C. §§ 101–36 (1970).

**4.** 42 U.S.C. § 4332 (1970).

**5.** 42 U.S.C. § 1857(a) (1970).

**6.** There have been cases that have considered the applicability of the § 553(a)(2) exemption for contracts. *See, e.g., Housing Authority of the City of Omaha v. U.S. Housing Authority,* 468 F.2d 1 (8th Cir. 1972), *cert. denied,* 410 U.S. 927, 93 S.Ct. 1360, 35 L.Ed.2d 588 (1973); *Rainbow Valley Citrus Corp. v. FCIC,* 506 F.2d 467 (9th Cir. 1974); *Langevin v. Chenango Court, Inc.,* 447 F.2d 296 (2d Cir. 1971); *Hahn v. Gottlieb,* 430 F.2d 1243 (1st Cir. 1970); *Rodriquez v. Swank,* 318 F.Supp. 289 (N.D.Ill.1970) *aff'd by memorandum order,* 403 U.S. 901, 91

S.Ct. 2202, 29 L.Ed.2d 677 (1971). It has generally been assumed that the § 553(a)(2) exemption is a broad one. See Bonfield, *Public Participation in Federal Rulemaking Relating to Public Property, Loans, Grants, Benefits or Contracts,* 118 U.Pa.L.Rev. 540, 555–57, 564–66 (1970), and the description at 583–88 of previous Congressional proposals to narrow the scope of that exemption.

**7.** 23 U.S.C. § 128 reads in full:

§ 128. Public hearings

(a) Any State highway department which submits plans for a Federal-aid highway project involving the bypassing of, or going through, any city, town, or village, either incorporated or unincorporated, shall certify to the Secretary that it has had public hearings, or has afforded the opportunity for such hearings, and has considered the economic and social effects of such a location, its impact on the environment, and its consistency with the goals and objectives of such urban planning as has been promulgated by the community. Any State highway department which submits plans for an Interstate System project shall certify to the Secretary that it

ercises by delegation the functions vested in the Secretary of Transportation, has implemented § 128 by providing a two-stage preliminary hearing and approval sequence for a proposed highway—one stage for the highway route location, and one for the design. Location approval determines the corridor through which the proposed highway is to pass, and is preceded by a "corridor public hearing." 23 C.F.R. § 790.3(a).[8] Design approval determines the major technical specifications of the highway as a whole and its exact location, and is preceded by a "design public hearing." 23 C.F.R. § 790.3(b).[9] In cases where a corridor hearing held previously is considered inadequate because of new information or proposals and a new corridor hearing is held, one of the regulations challenged in this appeal now permits the Administration's division engineers to approve requests of state highway agencies to combine the corridor hearing and the design hearing, and to request location and design approval simultaneously.[10] The other challenged regulation [11] authorizes federal funding for acquisitions of highway rights-of-way prior to the corridor hearing.[12] Both of these modifications in

has had public hearings at a convenient location, or has afforded the opportunity for such hearings, for the purpose of enabling persons in rural areas through or contiguous to whose property the highway will pass to express any objections they may have to the proposed location of such highway. Such certification shall be accompanied by a report which indicates the consideration given to the economic, social, environmental, and other effects of the plan or highway location or design and various alternatives which were raised during the hearing or which were otherwise considered.

(b) When hearings have been held under subsection (a), the State highway department shall submit a copy of the transcript of said hearings to the Secretary, together with the certification and report.

8. (a) A "corridor public hearing" is a public hearing that:

(1) Is held before the route location is approved and before the State highway department is committed to a specific proposal.

(2) Is held to ensure that an opportunity is afforded for effective participation by interested persons in the process of determining the need for, and the location of, a Federal-aid highway; and

(3) Provides a public forum that affords a full opportunity for presenting views on each of the proposed alternative highway locations and the social, economic, and environmental effects of those alternate locations. 23 C.F.R. § 790.3(a) (1976).

9. (b) A "highway design public hearing" is a public hearing that: (1) Is held after the route location has been approved, but before the State highway department is committed to a specific design proposal.

(2) Is held to ensure that an opportunity is afforded for effective participation by interested persons in the process of determining

the specific location and major design features of a Federal-aid highway; and

(3) Provides a public forum that affords a full opportunity for presenting views on major highway design features, including the social, economic, environmental, and other effects of alternate designs.
23 C.F.R. § 790.3(a) (1976).

10. (g) With respect to any project for which a public hearing has been held under Federal-aid procedures, and for which it is determined by the State highway department and the Division Engineer that a new hearing is desirable to consider supplemental information on social, economic, or environmental effects relative to proposals presented at a previous public hearing or with respect to additional proposals, then, as appropriate, a new corridor or design hearing should be held. When recommended by the State and approved by the Division Engineer, a new corridor hearing held in accordance with this section may be combined with the design hearing, whether or not a design hearing for the project has been previously held. In such instances, the location shall be reconsidered and a new request for location approval shall be submitted together with the request for design approval.
23 C.F.R. § 790.5(g) (1976).

11. *See* 23 C.F.R. § 790.9(f) (1976):

(f) The Division Administrator, under criteria promulgated by the Federal Highway Administration, may in other appropriate instances authorize the acquisition of right-of-way before a design hearing or, in exceptional cases, with the approval of the Regional Administrator, before a corridor hearing.

12. See footnote 37 for text of 23 U.S.C. §§ 108, 124, giving statutory authorization of parcel acquisition at least two years prior to any planned construction of the acquired land.

existing procedures are alleged to have substantially restricted the public's opportunity to participate in the highway planning process.

Appellant Federation urges that these major changes in existing procedures cannot be achieved unless FHWA observes the notice and comment promulgation procedures provided in § 553. It argues that the § 553(a)(2) exemption for agency grants should be read narrowly, in accord with the Congressional intent revealed in the APA's legislative history, and that the exemption does not extend to regulations governing the procedures under which grants are given, as opposed to the grants themselves. A serious gap in the APA would be created, says appellant, if the (a)(2) exemption omits from the APA's procedural protections all regulations addressed to the rights or welfare of the general public that are promulgated in connection with any of the massive federal grant-in-aid programs.

We do not disagree with appellant's diagnosis of the problem. Yet we conclude that, as written, the APA does create a serious gap in the procedural protections the APA was enacted to provide. At least in the context of the federal highway grant-in-aid program, we can find no principled way to remedy that gap by a narrowing construction. As a matter of policy, Congress might have done better to anticipate that the federal grant and benefit programs the government would come to administer would have a direct policy impact on individual citizens and society as a whole. Its desire that legislative functions in administrative agencies "be exercised only upon some form of public participation after notice"[13] might better have been served by recognizing that spending money always involves public choices, often significant public choices that could benefit from the ventilation of views that public participation entails. A number of agencies apparently exempt from rulemaking under subsection (a)(2) have recognized these benefits and have provided by regulation for notice and comment procedures prior to adoption of policy regulations for grant or benefit programs. *See, e. g., Rodway v. U. S. Department of Agriculture*, 168 U.S.App. D.C. 387, 514 F.2d 809 (1975); 29 C.F.R. § 2.7 (1975).[14] The FHWA has also engaged in notice and comment rulemaking but it has not bound itself to follow this course. We must determine FHWA's procedural obligations under the Act.

National Wildlife cites legislative history indicating that the (a)(2) exemption was limited to "proprietary matters,"[15] and urges that proprietary matters be construed as limited to those functions that are essentially managerial and do not ordinarily involve questions of substantive public policy. Congress may well have provided an exemption in contemplation of "proprietary matters" relatively innocuous or insignificant. However, the use of that term in the legislative history was apparently only a shorthand reference to the public property, loans, grants, benefits and contracts exempted in subsection (a)(2). Congress viewed these activities as proprietary in character and exempted them because "the principal considerations in most such cases relate to mechanics and interpretations or policy, and it is deemed wise to encourage and facilitate the issuance of rules by dispensing with all mandatory procedural re-

---

13. "Administrative Procedure Act, Legislative History," S.Doc.No.248, 79th Cong., 2d Sess. 358 (1946) (hereinafter cited as "Legislative History") (Cong. Walter).

14. *See also* Strauss, *Rules, Adjudications, and Other Sources of Law in an Executive Department: Reflections on the Interior Department's Administration of the Mining Law*, 74 Colum.L. Rev. 1231, 1249 (1974), describing the Department of Interior's administration of the General Mining Law.

15. "Legislative History" at 358 (Cong. Walter); Senate Committee on the Judiciary, "Administrative Procedure Act," S.Rep.No.752, 79th Cong., 1st Sess. (1945), in "Legislative History" at 199; House Committee on the Judiciary, "Administrative Procedure Act," H.Rep.No. 1980, 79th Cong., 2d Sess. 1946), in "Legislative History" at 257.

quirements."[16] The mechanical implementation of "proprietary" programs was prominent, but it did not define the exemption. Congress instead included matters of interpretation and policy[17] by way of example, and implicitly recognized that the exemption would also cover cases where those "principal considerations" it expected to characterize "most cases" would not apply.[18]

The House and Senate Committee reports do indicate that the excepted subjects must be "directly" or "clearly and directly involved" in order to make the exemption operative.[19] But this does not mean that when excepted subjects are clearly involved, the exemption reaches only mechanical rules on those subjects. Clearly Congress meant to confine the (a)(2) exemption to its express terms, to prevent its use as an all purpose escape clause. But there can be no doubt that the regulations challenged in this case are both clearly and directly related to a federal grant program. One changes the approval process necessary to maintain state highway department eligibility for federal funds; the other allows federal funds to be used for right-of-way acquisitions before the normal location and design approvals have been given. These regulatory decisions go beyond mere managerial mechanics.[20] They directly affect the general public's hearing and participation rights in the administration of the federal grant-in-aid program. However, there is a clear and direct connection with an exempted "proprietary" subject, and this excuses the FHWA from an overall statutory obligation to comply with notice and comment procedures in promulgating the challenged regulations.

## II.

There remains the issue whether the advance acquisition regulation is consistent with the Federal Highway Act.[21] Evaluation of this contention requires a factual understanding of the Federal Highway Act and its administration, and how the challenged practice fits into the overall scheme of regulation. To that setting we now turn—albeit with diffidence if not trepidation, in view of the rudimentary guidance given us by both counsel.

## A.

Although there has been a federal-aid highway program of sorts ever since 1921, the Federal Aid Highway Act of 1944, establishing the "A-B-C" system, set the basic framework for the current aid program. The 1956 Act made clear the nation's priority commitment to build a nationwide highway system of 40,000 miles, and worked out a funding system to finance it into reality.[22]

16. "Legislative History" at 199 (Senate Report).

17. Appellants suggest that no extra weight should be given to the explanation's inclusion of interpretations or policy, since § 553(b)(A) exempts interpretative rules and general statements of policy. That exemption as specifically interpreted would not, however, appear in any case to be coextensive with a section like (a)(2), intended to exempt all policy determinations in the course of administering a proprietary responsibility. *See e. g., Pacific Gas & Elec. Co. v. FPC,* 164 U.S.App.D.C. 371, 506 F.2d 33 (1974).

18. See text at note 16.

19. "Legislative History" at 199 (Senate Report) (Sec. 553 is inapplicable "only 'to the extent' that the excepted subjects are directly involved"); *id.* at 257 (House Report) (the excepted subjects must be "clearly and directly involved").

20. On analysis it might well prove that very few grant and benefit program decisions with direct impact on the lives of individual citizens could be so characterized.

21. 23 C.F.R. § 790.5(g) was not challenged on the merits.

22. For useful accounts of the historical development of the federal-aid highway system and the FHWA's current administration of it, *see* Mashaw, *The Legal Structure of Frustration: Alternative Strategies for Public Choice Concerning Federally Aided Highway Construction,* 122 U.Pa.L.Rev. 1 (1973); Schwartz, *Urban Freeways and the Interstate System,* 49 So.Cal. L.Rev. 406 (1976). *See also* Peterson and Kennan, *An Analysis of Administration of the Federal-Aid Highway Program,* 2 ELR 50001 (1972). Since Peterson and Kennan were involved as counsel and legal intern with the National Wildlife Federation, their article is cited only as a matter of convenience of description and background.

The Act established a series of federally approved requirements for state highway departments seeking federal funding for their planned highways. In theory, the Administration evaluates state compliance with federal standards through a review of documentary evidence; in practice the FHWA division engineer cooperates to help the state highway department "improve its planning and engineering capabilities through a process of continuous and close working liaison." [23]

Because building highways can be controversial and disruptive, Congress has superimposed on the federal-aid highway program a series of steps and standards that seek to incorporate into the process of highway designations deliberate attention to a number of objectives: citizen participation; relocation assistance; environmental quality; transportation planning that is comprehensive; and other social values. [24] Questions have been raised as to whether the FHWA has integrated these various standards into the administrative process in a way that would assure systematic consideration of the values they represent at optimal points in the decision process. [25] Thus FHWA hearing regulations recite that the "need" [26] for the highway is for comment at

23. Mashaw, *Legal Structure, supra* at 15.

24. Mashaw, *supra,* provides a simplified and helpful account of the resulting federal administration of the approval process at 14–15:

> We might for example, break up the grant process into four major stages in the approval of a particular construction project.[62] The first decision that might be made by FHWA is whether to add the proposed highway section to one of the federal-aid systems; this step must precede inclusion of the project in an annual state highway "program." [63] When it asks FHWA for program approval, the state will have already determined the need for the highway projects included in the program, established priorities among those projects, and coordinated these proposals with state and local planning in a manner sufficient to satisfy the BOB Bulletin A–95 review procedure.

> The next step is a request by the state highway department for approval of the location of the project and for authorization to begin design engineering and right-of-way work. The state must certify that it has studied alternative locations, prepared an initial relocation plan, advertised and held public hearings on the location if requested, considered the hearing comments, selected a location and publicized its request for FHWA approval. If FHWA does not already have documents supporting these certifications, they will be filed at this time.

> The next request to FHWA is for approval of the state's design plans [64] and its final right-of-way and relocation plans. At this point the state must have publicized the previous location approval, studied alternative designs, and developed a final location plan, advertised and held a design public hearing if requested, evaluated the hearing comments

and select a design, and publicized the request for design approval. The submission to FHWA is again by certification with accompanying documents, for example the transcript of the design public hearing. The final stage in committing federal monies for a highway project is approval of the state's plans, specifications and estimates [65] on the basis of its certifications, *inter alia,* of completion of right-of-way acquisition and provision of relocation assistance.

> [62] The sequence of steps outlined here for approval of federal-aid highway projects relies heavily on Federal Highway Administration, U.S. Dept. of Transportation, Review of Federal Aid Highway Programs app. 1, charts I–A to I–E (1970) [hereinafter cited as Federal Aid Programs].
> [63] *See* 23 U.S.C. § 105 (1970).
> [64] *See* 23 C.F.R. 790.3(d) (1973).
> [65] *See* 23 U.S.C. § 106 (1970).

25. The difficulty may arise from the fact that *the original administrative system was designed to optimize sound fiscal management rather than environmental planning or citizen participation in the decision process.* For example, FHWA's series of approval steps applies to any "project" submitted by a state highway department. A "project" is one of many severable portions of the acquisition, design, or construction work related to a highway or segment. *See* 23 U.S.C. § 101(a). Hence the approval process may not be well suited to comprehensive planning.

26. A corridor public hearing "is held to ensure that an opportunity is afforded for effective participation by interested persons in the process of determining the need for, and the location of, a Federal-aid highway." 23 C.F.R. § 790.3(a)(2).

a corridor public hearing. But by the time of this location phase, need has already been established to the satisfaction of those planning the highways.[27] By the time a proposed route reaches the location phase— when a NEPA statement[28] and the first public hearing are normally required[29]—the route has already been put on a federal-aid system by the FHWA and has been included in the construction program submitted annually by the state.[30] And prior to the time of submission of the construction program, the state will have made a determination as to the need for the highway projects included in the program, established project priorities, and coordinated these proposals with state and local planning.[31] "Thus, although the need for [a highway] might be disputed, the determination that it should be built has already been made by planners and politicians alike."[32]

To implement the legislative scheme for consideration of environmental and social values, courts have taken steps to assure consideration at a point that is meaningful. They have ruled that location approval, given after the first public hearing, constitutes major federal action triggering NEPA requirements. *See Indian Lookout Alliance v. Volpe,* 484 F.2d 11, 16–17 (8th Cir. 1973) and cases cited. They have concluded that acquisition of land for a highway may preclude the objectivity required by NEPA, and have enjoined further acquisition of land until compliance with NEPA can be demonstrated. *Lathan v. Volpe,* 455 F.2d 1111 (9th Cir. 1971).[33] In recognition of

"ever increasing congressional concern that highway planners be directly and publicly confronted with opposing views," this Court has refused to hold that a statute directing construction of certain portions of the Interstate Highway System was an implied repeal or modification of § 128 hearing requirements. *D.C. Federation of Civic Associations v. Volpe,* 140 U.S.App.D.C. 162, 167, 434 F.2d 436, 441 (1970).

We are similarly called upon in this case to assure that the procedures adopted by FHWA are consistent with Congress's clear intent to incorporate new values into the highway decisionmaking process. The challenged regulation permits state highway departments to be reimbursed for right of way parcels that they have acquired in advance of any public hearing or environmental analysis of the location or desirability of the planned highway.[34] Such acquisitions are allowed in "exceptional circumstances," defined as "hardship acquisitions" and acquisitions involving "protective buying." 23 C.F.R. § 712.204(d). Hardship acquisitions are purchases necessary to "alleviate particular hardship to a property owner . . . because of an inability to sell his property." Protective buying is buying necessary to "prevent imminent development and increased costs of a parcel which would tend to limit the choice of highway alternatives." Though termed "exceptional" by the FHWA, these situations are essentially the basic reasons for any advance acquisition program.[35]

---

27. Mashaw, *Legal Structure, supra* at 23.

28. *See* 23 C.F.R. §§ 771.5(c), (d), (e) (1976).

29. *See* 23 C.F.R. § 790.3(a)(1) (1976).

30. Mashaw, *Legal Structure, supra* at 23 n.86.

31. *See* footnote 24.

32. Mashaw, *Legal Structure, supra* at 23 n.86.

33. The court left open the possibility that the court might itself approve hardship acquisitions where special need is shown. *See also*

*Keith v. Volpe,* 352 F.Supp. 1324, 1355 (C.D. Cal.1972), *aff'd on other grounds, sub nom. Keith v. California Highway Comm'n,* 506 F.2d 696 (1974) (9th Cir. 1973) *cert. denied,* 420 U.S. 908, 95 S.Ct. 826, 42 L.Ed.2d 837 (1975); *Thompson v. Fugate,* 452 F.2d 57 (4th Cir. 1971) and 347 F.Supp. 120 (E.D.Va.1972) (on remand); *Arlington Coalition on Transportation v. Volpe,* 458 F.2d 1323, 1327, 1333–34 (4th Cir.), *cert. denied,* 409 U.S. 1000, 93 S.Ct. 312, 34 L.Ed.2d 261 (1972).

34. 23 C.F.R. § 790.9(f), quoted in note 11.

35. *See, e.g.,* discussion in text at note 43.

Use of Federal funds for advance acquisition of rights-of-way antedates World War II and explicit statutory authorization of the practice.[36] The first clear indication of Congressional intent that advance acquisition could be used to facilitate the highway program came in the Federal-Aid Highway Act of 1956. As a practical matter, however, the rules of apportioning money under the highway trust fund worked to preclude states from investing funds in the acquisition of property in advance of current needs. To make the advance acquisition authorization operational, Congress in 1968 established a right-of-way revolving fund and authorized advances to a state agency—to be charged against the state's future federal highway fund allocations—for advance acquisitions of right-of-way parcels. The "advance" acquisitions were limited in time terms—to parcels acquired no less than 2 nor more than 10 years prior to actual construction.[37]

36. U.S. Department of Transportation, *Advance Acquisition of Highway Rights-of-Way Study* (1967), pp. 23–24.

37. § 108. Advance acquisition of rights-of-way

(a) For the purpose of facilitating the acquisition of rights-of-way on any of the Federal-aid highway systems, including the Interstate System, in the most expeditious and economical manner, and recognizing that the acquisition of rights-of-way requires lengthy planning and negotiations if it is to be done at a reasonable cost, the Secretary, upon the request of the State highway department, is authorized to make available the funds appropriated to any State for expenditure on any of the Federal-aid highway systems, including the Interstate System, for acquisition of rights-of-way, in anticipation of construction and under such rules and regulations as the Secretary may prescribe. The agreement between the Secretary and the State highway department for the reimbursement of the cost of such rights-of-way shall provide for the actual construction of a road on such rights-of-way within a period not exceeding ten years following the fiscal year in which such request is made.

(b) Federal participation in the cost of rights-of-way acquired under subsection (a) of this section shall not exceed the Federal pro rata share applicable to the class of funds from which Federal reimbursement is made.

(c) (1) There is hereby established in the Treasury of the United States a revolving fund to be known as the right-of-way revolving fund which shall be administered by the Secretary in carrying out the provisions of this subsection. Sums authorized to be appropriated to the right-of-way revolving fund shall be available for expenditure without regard to the fiscal year for which such sums are authorized.

(2) For the purpose of acquiring rights-of-way for future construction of highways on any Federal-aid system and for making payments for the moving or relocation of persons, businesses, farms, and other existing uses of real property caused by the acquisition of such rights-of-way, in addition to the authority contained in subsection (a) of this section, the Secretary, upon request of a State highway department, is authorized to advance funds, without interest, to the State from amounts available in the right-of-way revolving fund, in accordance with rules and regulations prescribed by the Secretary. Funds so advanced may be used to pay the entire costs of projects for the acquisition of rights-of-way, including the net cost to the State of property management, if any, and related moving and relocation payments made pursuant to section 133 or chapter 5 of this title.

(3) Actual construction of a highway on rights-of-way, with respect to which funds are advanced under this subsection, shall be commenced within a period of not less than two years nor more than ten years following the end of the fiscal year in which the Secretary approves such advance of funds, unless the Secretary, in his discretion, shall provide for an earlier termination date. Immediately upon the termination of the period of time within which actual construction must be commenced, in the case of any project where such construction is not commenced before such termination, or upon approval by the Secretary of the plans, specifications, and estimates for such project for the actual construction of a highway on rights-of-way with respect to which funds are advanced under this subsection, whichever shall occur first, the right-of-way revolving fund shall be credited with an amount equal to the Federal share of the funds advanced, as provided in section 120 of this title, out of any Federal-aid highway funds apportioned to the State in which such project is located and available for obligation for projects on the Federal-aid system of which such project is to be a part, and the State shall reimburse the Secretary in an amount equal to the non-Federal share of the funds advanced for deposit in, and credit to, the right-of-way revolving fund.

In the same act, Congress amended Section 128(a)'s public hearing requirement, to mandate consideration of social and environmental effects of a highway location and its consistency with community urban planning objectives.[38] The amendment responded to a recognized "need to increase the effectiveness of public hearings."[39] There was no provision in the language of either amendment concerning the central question of timing at stake in this appeal—whether, in order to give effect to the public hearing section of the Act, a hearing is a necessary precondition to any advance acquisition otherwise authorized by the Act. There is legislative history, however, as we shall develop in part C. But first we interject to discuss the issue of ripeness.

### B.

The District Court did not reach the central question of statutory construction, on the ground that it was not ripe for decision. We reverse.

In a trilogy of food and drug cases, the Supreme Court articulated standards governing the timing of judicial review in pre-enforcement suits challenging administrative regulations. *See Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); *Toilet Goods Ass'n, Inc. v. Gardner*, 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967); and *Gardner v. Toilet Goods Ass'n, Inc.*, 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967). Before accepting such a suit, the court must "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Laboratories, supra*, 387 U.S. at 149, 87 S.Ct. at 1515. In the two cases held to be ripe for review, the Court concluded that the issues presented were legal ones that would not be enhanced by a further factual record, and that hardship to the parties would result if court review were withheld. The same consideration applies to the case before us. The question is a legal one, whether the advance acquisition regulation is consistent with the FHWA's statutory authority under the Highway Act. Appraisal of the statutory requirements will not be enhanced by a factual record. The allegation that advance acquisitions will subjectively undermine the effectiveness of subsequent public hearings and environmental analysis is not one predictably susceptible to proof in a particular highway approval process. Plainly, the failure to follow procedures designed to insure objective consideration of environmental values works an injury which is difficult to repair after the decisionmaker has reached a commitment to a particular proposed project or course of action. *Calvert Cliffs Coordinating Comm. v. AEC*, 146 U.S.App.D.C. 33, 449 F.2d 1109 (1971).

---

23 U.S.C. § 108 (1975 Supp.).
§ 124. Advances to States
If the Secretary shall determine that it is necessary for the expeditious completion of projects on any of the Federal-aid systems, including the Interstate System, he may advance to any State out of any existing appropriations the Federal share of the cost of construction thereof to enable the State highway department to make prompt payments for acquisition of rights-of-way, and for the construction as it progresses. The sums so advanced shall be deposited in a special revolving trust fund, by the State official authorized under the laws of the State to receive Federal-aid highway funds, to be disbursed solely upon vouchers approved by the State highway department for rights-of-way which have been or are being acquired, and for construction which has been actually performed and approved by the Secretary pursuant to this chapter. Upon determination by the Secretary that any part of the funds advanced to any State under the provisions of this section are no longer required, the amount of the advance, which is determined to be in excess of current requirements of the State, shall be repaid upon his demand, and such repayments shall be returned to the credit of the appropriation from which the funds were advanced. Any sum advanced and not repaid on demand shall be deducted from sums due the State for the Federal pro rata share of the cost of construction of Federal-aid projects.
23 U.S.C. § 124 (1976).

**38.** Quoted in present form in note 7.

**39.** S.Rep.No.1340, 90th Cong., 2d Sess. (1968) 6, on the Federal-Aid Highway Act of 1968, P–L 90–495, U.S.Code Cong. & Admin.News 1968, pp. 3482, 3487.

Since the challenged regulation is presently being implemented, the prospect of present and continuing harm to petitioners is substantial—if they are right in their assertion that the procedures mandated by the Highway Act and NEPA are being evaded. The issue of harm and the issue on the merits are intertwined.[40] Sound principles of judicial administration lead us to conclude that review of the core legal question cannot fairly be delayed until after particular location decisions have been made and approved. We therefore turn to the merits of petitioner's claim.[41]

### C.

And so we come to the issue of Congress's intent when in 1968 it simultaneously made substantial amendments to Highway Act sections dealing with public hearings and advance acquisitions. Respondents contend that the statute is unambiguous, and that the only legislative history relevant to the question of interpretation is that of the Federal-Aid Highway Act of 1956, which gave statutory authorization for advance acquisitions. We find those arguments unpersuasive.

The statute as presently written says nothing about when a public hearing should take place in relation to an advance acquisition. Indeed it says nothing about when a public hearing should take place in relation to the responsibilities the Administration exercises routinely when no advance acquisitions are proposed.[42] It simply provides for a hearing on the location of a highway and for consideration of effects and alternatives, before applying for federal approval of a highway project, and for federal

approval of advance acquisitions of rights-of-way in anticipation of later construction. We look to the legislative history for guidance.

We are engaged in interpreting the federal aid highway statute, as amended and as a whole. Insofar as this case is concerned, the 1968 amendments to that statute are of controlling significance. As demonstrated by the 1967 Department of Transportation study on advance acquisition of rights-of-way commanded by § 10 of the Federal Aid Highway Act of 1966,[43] the advance acquisition program authorized in 1956 had never gotten off the ground because of inadequate funding. The Study confirmed the utility of acquiring right-of-way parcels significantly in advance of construction. It concluded that an advance acquisition program can minimize costs by forestalling costly development of land ultimately required for highway purposes (protective buying); that more orderly relocation of existing property users can be achieved (hardship buying); that better community planning is possible with early identification of highway locations; that resultant leadtime facilitates advance engineering planning and design; that negotiations can go forward without the pressure of short deadlines; and that economic waste is diminished.[44] These enumerated benefits are based on the assumption that advance acquisition signals a commitment to building a highway. Indeed the study cautions that "a program of advance right-of-way acquisition should be undertaken with great caution to make sure that commitments are not made only to be abandoned after further study is made. Ad-

---

**40.** *Delaware & Hudson Ry. Co. v. United Transportation Union,* 146 U.S.App.D.C. 142, 158–9, 450 F.2d 603, 619–20, *cert. denied,* 403 U.S. 911, 91 S.Ct. 2209, 29 L.Ed.2d 689 (1971).

**41.** The Government also asserts that petitioners lack standing to challenge on the merits the advance acquisition regulation. *United States v. SCRAP,* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973) establishes the right on an environmental protective organization to challenge governmental action, alleged to have adverse effects on the environmental interests of its members, as contrary to the provisions of

environment protecting legislation. We are satisfied that the allegations of the instant complaint satisfy pertinent requirements.

**42.** *See e. g.,* § II.A *supra* and n. 24, describing the series of formal and informal approvals the Administration gives to the state in the course of its planning a highway.

**43.** Public Law 89–574, 89th Cong. (1966).

**44.** DOT Study *cit. supra* note 36 at 2, 13–14.

vance planning and engineering must be of sufficient depth and scope as to minimize the necessity for changes in the highway location or right-of-way requirements."[45] Accordingly the study recommended that in the execution of the "substantially new program"[46] it suggested, and Congress later adopted, "no advance right-of-way shall be acquired prior to at least one public hearing and firm establishment of location."[47] The premise of the architects of the funded acquisition program—that firm commitment to location would necessarily precede any advance acquisition of right-of-way—is undercut by the current FHWA position that its regulations are designed to prevent advance acquisitions from influencing the environmental assessment of a project, the decision whether or not to build a project, and the selection of a specific location. 23 C.F.R. § 712.204(d)(3).[48] Section 108's limitation of Federal reimbursement to those parcels actually used in highway construction is similarly persuasive that Congress assumed that the parcels would be bought with the firm intention of building a highway over them.

Like the inoperative advance acquisition program prior to 1968, the public hearing provision of the Act prior to 1968 was limited in impact, requiring a hearing limited to "economic effects" whenever a highway either "bypasses or enters into" an urban area. In 1968, Section 128(a) was amended to require consideration of social, environmental, and community urban planning effects. Rather like NEPA's effect of insert-ing new environmental values wholesale into the federal government's established decision process, Sec. 128 mandated the insertion of new values into the federal highway decision process. In both instances, however, the reforms envisioned by these enactments were not spelled out in the statute in detail. Section 128 was designed to sweep broadly—to respond to the "need to increase the effectiveness of public hearings;" to "emphasize the importance of these hearings;" and to make clear that participant views would be "considered and weighed."[49] As long as its goals could be satisfied, § 128 left room for some interpretation by agency or court. But as a House Report explained in 1970, "the hearings would be a useless formality" if a final determination of location was made before the location hearing was held.[50]

This examination of the background of the advance acquisition and public hearing provisions leads us to conclude that the firm commitment to location Congress generally envisioned as a condition precedent to advance acquisitions can be made only *after* a location hearing considering alternatives to that location has been held. Otherwise the hearing process becomes little more than a charade. Given the plain desire of Congress to increase the effectiveness of those hearings, an agency interpretation of the statute directly contrary to that intent cannot be given customary deference. Nor can we defer to an agency's changing its mind about how to

45. DOT Study at 14.

46. DOT Study at 11.

47. DOT Study at 10. The study also recommended that no "advance right-of-way be acquired for a project in an urban area unless the project is deemed to be consistent with the comprehensive transportation plan developed for the metropolitan area as a whole under the provisions of section 134 of title 23 . . . .". P. 10.

48. Because of respondent's prominent reliance on *Gage v. AEC,* 156 U.S.App.D.C. 231, 236, n.17, 479 F.2d 1214, 1219, n.17 (1973) as establishing the principle that acquisition of property prior to environmental assessment of a proposed project to be federally approved does not

prejudice that assessment, we note that that case specifically refused to decide that question in the absence of a developed record on the issues presented. We need not make a factual inquiry into the extent of commitment resulting from advance acquisitions in this case, in light of Congress' clear intent that a commitment to location be made *before* advance acquisitions are made.

49. S.Rep. No. 1340, 90th Cong., 2d Sess. 6, 10–11 (1968), U.S.Code Cong. & Admin.News, p. 3492.

50. H.R.Rep. No. 91–1554, 91st Cong., 2d Sess. 6–7 (1970), U.S.Code Cong. & Admin.News 1970, pp. 5392, 5396.

administer a program when the change seeks to exercise a discretion not properly found in the Act. By allowing advance acquisitions without prior hearings whenever protective buying or hardship buying is the object, the Administration has effectively drafted an exception from § 128's requirements whenever advance acquisition authority is exercised. No such broad exclusion is suggested on the face of the statute or in accompanying expressions of Congressional intent.[51]

Our reconciliation of the purposes expressed in the advance acquisition and public hearing sections is confirmed by both legislative and executive commentary in the legislative history. Congressional understanding of the interrelation between the beefed-up public hearing and advance acquisition sections was shaped by a letter from the Secretary of DOT, as well as by the study report already referred to. Secretary Boyd noted that the proposed legislation would implement the conclusions of the DOT study and continued:

> We note that section 128 of title 23 presently imposes certain requirements for public hearings in connection with Federal-aid highway projects. That requirement would not be affected by the proposed bill. In addition . . . if this legislation is enacted, appropriate regulations will be promulgated to insure that in the administration of the program no advance right-of-way will be acquired

prior to public hearing and firm establishment of location . . .[52]

In language tracking that of both the DOT study and the Secretary's letter, the report of the Senate Public Works Committee stated:

> The public hearings requirements of Section 128 . . ., would not be affected by this [advance acquisition] section; appropriate regulations will be promulgated to insure that no advance right-of-way will be required [sic, acquired] prior to public hearing and the firm establishment of the location of the project.[53]

We read this express consideration of the interrelation of the two sections as an adoption of the Secretary's representation that no advance right of way would be acquired prior to public hearing, and as an affirmation of our independent reconciliation of the goals those provisions sought to implement. This decision does not make advance acquisitions possible only when a public hearing is held. We have already adverted to the possibility that narrower regulations could be drafted. And the truly federal character of the federal aid highway system—its recognition that a state need not immediately decide whether its planned highway will be built with federal aid—allows a state to finance such acquisitions out of its own funds, and later decide to include the proposed highway in the federal aid system.[54] We simply conclude that

---

51. We need not now decide whether a regulation defining "emergency" more narrowly to avoid swallowing up the entire advance acquisition program could properly allow advance acquisitions in some special instances, even when not preceded by a public hearing. The FHWA regulation at stake in this case does not present that question. Nor can we rely, as Judge Wilkey suggests, on the good faith of responsible federal government officials to reach this result, since the regulation delegates that decision to state officials.

52. Reprinted in S.Rep. No. 1340, *supra* at 39, U.S.Code Cong. & Admin.News 1968, p. 3519.

53. S.Rep. No. 1340, *supra* at 25, U.S.Code Cong. & Admin.News 1968, p. 3506.

54. Congress has noted without disapproval that "a number of State highway departments

frequently acquire rights-of-way for Federal-aid highways . . . with non-Federal funds, and seek Federal financial assistance only for the actual construction work." H.R.Rep. No. 91–1656, 91st Cong., 2d Sess. 4 (1970) (accompanying Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970), U.S.Code Cong. & Admin.News 1970, pp. 5850, 5853. If the state gives up the carrot of participation in the federal advance funds program, it may properly escape some of the requirements by which the federal government conditions the expenditure of federal money that would otherwise have been spent. The situation is not unlike that posed by the timing of NEPA statements on highway projects, which serve many of the same values protected in § 128 public hearings. See cases cited at note 33. The courts have recognized that the states may get preliminary FHWA approvals to maintain eligibility for the federal aid system without com-

federal funds cannot ordinarily be used to finance advance acquisition of right-of-way parcels prior to a location hearing.

The judgment dismissing the complaint is vacated and the case remanded for entry of a decree in accordance with this opinion.

*So ordered.*

WILKEY, Circuit Judge (dissenting):

I concur with Judge Leventhal's opinion for the majority in regard to parts I and II.A. I respectfully dissent in regard to part II.B, the question of timing, "whether, in order to give effect to the public hearing section of the Act, a hearing is a necessary precondition to any advance acquisition otherwise authorized by the Act." [1]

There are two valid reasons for prospective purchases (advanced acquisition) from the revolving highway fund: (1) to relieve individual hardship of prospective sellers when a well founded belief exists that a projected highway will take a certain route, and yet the actual implementation of the purchases has not begun; and (2) to protect the government (taxpayers) by purchasing in advance of the public decision, thus avoiding speculative price increases, which is simply good business-like management of government property. Prospective purchasing thus is a highly necessary authority for the Federal Highway Administration (FHWA) to have—and to be able to exercise effectively.

This power on which the disputed regulations are based was granted by statute in 1956. The authority was not taken away by the 1968 changes enacted by Congress, however you may read the letter of the Secretary of Transportation and the Senate Committee report. Neither Executive Branch comments, "understandings" etc., nor Congressional committee reports repeal laws; the power once granted by statute is there until taken away by statute. The majority opinion points to no language in the 1968 legislation which does this.

It is thoroughly impractical and ineffective to telegraph the likely highway routes by public hearings, for then the power of prospective purchasing simply becomes a nullity. There is nothing prospective about it, and the benefits due the taxpayer by the wise employment of government funds before prices become inflated is lost.

The opposing consideration is, of course, that "advance acquisitions will subjectively undermine the effectiveness of subsequent public hearings and environmental analyses." [2] Obviously this is an important factor, and to the majority, the decisive consideration.

Of course I recognize the impact of the acquisition of right of way in advance by prospective purchasing, both the financial bias and the psychological tilt toward the ultimate decision which results. Probably the psychological twisting of the ultimate decision toward the right of way prospectively acquired is even greater than the financial bias involved. The financial bias can be cured by the resale of the land acquired and the purchase of other right of way. Yet the asserted bias by route purchase is a matter of degree. In *Gage v. Atomic Energy Commission,*[3] this court pointed out that all decisions preliminarily made influence the ultimate decision on site or route location. However, such influence is a matter of degree; some decisions influence the ultimate decisions more than oth-

mitting themselves to building the highway within that system. It is when the state applies for the location approval held to be a major federal action that NEPA's impact statement requirement comes into play. In contrast to conditioning the availability of *federal* advance acquisition funds on the holding of a public hearing, the legislative history gives no indication that state participation in the federal aid highway is to be foreclosed if it at first postpones the public hearing requirement for local approval by using its own funds to make ad-

vance acquisitions. The state would still, of course, be subject to the requirements of the Uniform Relocation Assistance Act of 1970, § 101(6). Nothing in this opinion reaches or forecloses that avenue of proceeding.

1. Maj.op. 182 U.S.App.D.C. ——, 561 F.2d 236.

2. Maj.op. 182 U.S.App.D.C. ——, 561 F.2d 236.

3. 156 U.S.App.D.C. 231, 479 F.2d 1214, 1219, n.17 (1973).

ers, a matter which must be evaluated in any individual case.

My position is simply that the task of balancing, and hopefully reconciling, two or more desirable goals, each of which has been authorized by statute, is not primarily the task of this court. A little judicial modesty would become us here.

First, it should be up to the responsible agency, the Federal Highway Administration, to implement the regulations by making prospective purchases without previous public environmental hearings in those instances in which the agency deems this action necessary. Certainly many, perhaps nearly all, purchases will be made after full consideration and public hearing on the environmental issues.

We have nothing in the way of a record on this point, and so until it is shown otherwise, I would believe that the responsible government agents would make prospective purchases with some consideration of the environmental impact, and that prospective purchases with only inadequate consideration of the environmental impact will turn out to be infrequently made.

Second, if the officials responsible for the employment of the highway revolving fund abuse their power to make prospective purchases, then we may anticipate that loud complaints will be registered with Congress. It will then be up to Congress to hold hearings and determine if, on the overall record of prospective purchases made and their ultimate environmental impact, there has been abuse of this authority to make prospective purchases, which unquestionably was granted by the 1956 legislation. If such turns out to be the case, then Congress can change the rule and deny completely or more carefully restrict the exercise of such prospective purchase power. Surely the judgment of Congress on this question, after holding the type of hearings on the facts of the situation which a court would find difficult to hold—certainly this appellate court—should reach a more just result than we can today, *de hors* any factual experience record whatever.

The power granted by the 1956 statute and the regulation to make prospective purchases in some instances will mean less environmental consideration given to the highway routes than would otherwise be desired. Whether this is desirable or undesirable seems to me to be a balancing judgment which Congress might have made at the time of enacting the 1968 changes, but on the record certainly did not make by repealing the 1956 authority to make prospective purchases, no matter what some testimony before a committee or a committee report said. It may well be that the power of prospective purchase of highway right of way, which to be effective usually must be without public hearings, is a power the government should have if it is exercised reasonably.

In my opinion, the way to determine whether this power is exercised reasonably, and thus should be continued, is not for an appellate court in advance to assume that the power will be abused, and therefore to require a public hearing before the power of prospective purchasing is exercised, which would as a practical matter negate all benefits to be derived from prospective purchasing. Such a holding is not only based on an assumption of abuse of power, but also makes the policy choice in favor of environmental considerations, irrespective of other advantages to the government which are unquestionably found in prospective purchasing, duly authorized by statute.

I think it inappropriate for this Court to make this public policy judgment on the balance of valid competing considerations in the face of the authority granted by Congress in the 1956 Act; I would think it appropriate for Congress itself to make such a judgment as to which values it finds uppermost, balancing the environmental considerations in the statutes which it has enacted with the power of prospective purchasing which Congress also has authorized and has not repealed.