**SIERRA CLUB et al., Plaintiffs,**

v.

**ATLANTA REGIONAL COMMISSION et al., Defendants.**

**No. CIV.A. 101CV0428BBM.**

United States District Court,
N.D. Georgia,
Atlanta Division.

Jan. 18, 2002.

Stephen Wesley Woolf, Southern Environmental Law Center, Atlanta, GA, Robert E. Yuhnke, phv, Office of Robert E. Yuhnke, Boulder, CO, J. David Farren, phv, Southern Environmental Law Center, Chapel Hill, NC, for Sierra Club, Southern Organizing Committee for Economic and Social Justice, Georgia Coalition for the People's Agenda, Environmental Defense, plaintiffs.

William R. Bassett, Harvey M. Koenig, Mikel Lemual Purcell, Smith Bassett Pur-

cell & Koenig, Atlanta, GA, for Atlanta Regional Commission, Charles Krautler, Director, Atlanta Regional Commission.

Diane L. DeShazo, State of Georgia Law Department, Atlanta, GA, Daniel M. Formby, Rene Octavio Lerer, Thurbert E. Baker, Alan Gantzhorn, Office of State Attorney General, Atlanta, GA, Patricia T. Barmeyer, King & Spalding, Atlanta, GA, for Georgia Department of Transportation, Tom Coleman, Commissioner, Georgia Department of Transportation, Georgia State Transportation Board, Tom Triplett, W.P. Langdale, Sam M. Wellborn, Brad Hubbert, Emory C. McClinton, Johnny Gresham, Boyd Pettit, Harold Dixon, William G. Hasty, Sr., James L. Lester, Steve Reynolds.

Richard H. Deane, Jr., Julia B. Anderson, Office of United States Attorney, Northern District of Georgia, Atlanta, GA, John C. Cruden, phv-DOJ, Norman L. Rave, Jr., phv-DOJ, U.S. Department of Justice, Environment & Natural Resources Division, Washington, DC, James C. Thomason, III, nam, Federal Highway Administration, Assistant Regional Counsel, Atlanta, GA, U.S. Dept. of Transportation, Norman U.S. Department of Transportation, Secretary, Vince Federal Highway Administration (FHWA), Acting Administrator, Hiram Federal Transit Administration (FTA), Acting Administrator, Larry Division Administrator, Georgia Division, FHWA, Division Admin., Jerry Regional Administrator, FTA, Regional Admin., defendants.

Robert Clinton Chambers, George Daryl Wenick, Smith Currie & Hancock, Atlanta, GA, David M. Friedland, phv, Gus B. Bauman, phv, David M. Williamson, phv, Beveridge & Diamond, Washington, DC, for Advocates for Safe and Efficient Transp., Shepherd Const. Co., Inc., C.W. Mathhews Contracting Co., Inc., Mid State Const. & Striping, Inc., Tidwell Const. Co., Pittman Const. Co.

## ORDER

MARTIN, District Judge.

This action seeking injunctive and declaratory relief for violations of, *inter alia,* the Clean Air Act, is currently before the court on the plaintiffs' motion for partial summary judgment [Doc. No. 65–1], motion for partial summary judgment filed by defendant-intervenor Advocates for Safe and Efficient Transportation [Doc. No. 67–1], motion for partial summary judgment filed by defendants Norman Mineta, Vince Schimmoller, Jenna L. Dorn, Larry Dreihaup, and Jerry Franklin [Doc. No. 68–1], motion for partial summary judgment filed by defendants Atlanta Regional Commission and Charles Krautler [Doc. No. 69–1], and the motion for partial summary judgment filed by defendants Georgia Department of Transportation, Georgia State Transportation Board, Tom Coleman, Tom Triplett, W.P. Langdale, Sam M. Wellborn, Brad Hubbert, Emory C. McClinton, Johnny Gresham, Boyd Pettit, Harold Dixon, William G. Hasty, Sr., James L. Lester, and Steve Reynolds [Doc. No. 70–1].

## *Background*

The plaintiffs, four public interest organizations [1] with members who state they are affected by the air quality in the Atlan-

---

1. The plaintiff organizations include: the Sierra Club, Southern Organizing Committee for Economic and Social Justice, Georgia Co-

alition for the People's Agenda, and Environmental Defense. The complaint alleges jurisdiction under 28 U.S.C. § 1361 and under 28

ta metropolitan area, filed this action on February 13, 2001 against federal, state and regional transportation agencies and officers[2] for declaratory and injunctive relief. The suit challenges the agencies' adoption, approval and funding of the 2025 Regional Transportation Plan ("2025 RTP"), the 2001–03 Transportation Improvement Plan ("2001–03 TIP"), and the associated conformity determinations under section 176(c) of the Clean Air Act ("CAA"), 42 U.S.C. § 7506(c) for Atlanta's ozone nonattainment area. For the reasons that follow, the court denies intervenor-defendant ASET's motion for partial summary judgment, grants the remaining defendants' motions for partial summary judgment and denies the plaintiffs' motion for partial summary judgment. Before recounting the relevant facts, the court first discusses the federal statutes and regulations at issue.

## I. *Statutory Framework*

The CAA, 42 U.S.C. §§ 7401 *et seq.*, is a comprehensive program for controlling and improving the nation's air quality.[3] Under the CAA, the EPA identifies air pollutants that endanger the public health or welfare, determines what concentrations of those pollutants are safe, and promulgates those determinations as national ambient air quality standards ("NAAQS"). *See* 42 U.S.C. §§ 7408, 7409. Each state bears responsibility for ensuring that its ambient air meets the appropriate NAAQS. *See* 42 U.S.C. § 7407(a). Ozone is one of the pollutants identified and regulated by the EPA. *See* 40 C.F.R. § 50.9. Ozone is formed when nitrogen oxides ("NOx") react with volatile organic compounds in the presence of sunlight. One of the primary sources of NOx is motor vehicle emissions.

To meet the NAAQS for pollutants such as ozone, states must establish state implementation plans ("SIPs") that provide "for implementation, maintenance, and enforcement" of the EPA's air quality standards. 42 U.S.C. § 7410(a)(1). The CAA requires SIPs to include "enforceable emission limitations and other control measures, means, or techniques, . . . as well as schedules and timetables for compliance" to meet the NAAQS. 42 U.S.C. § 7410(a)(2)(A). States submit their SIPs to the EPA for

U.S.C. § 1331 through the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702 and 706.

**2.** The defendants include: Atlanta Regional Commission ("ARC"), Georgia Department of Transportation, Georgia State Transportation Board and the directors of these entities. The defendants also include the administrators of the United States Department of Transportation ("USDOT"), Federal Highway Administration, and the Federal Transit Administration. The Environmental Protection Agency ("EPA") is not a party to this suit. The Advocates for Safe and Efficient Transportation ("ASET") were later granted leave to intervene as a defendant. The defendants have filed their motions and briefs in their respective groups, including: ARC, the state defendants, the federal defendants and ASET. The

court will hereinafter refer to the various defendants by their group name.

**3.** The discussion of the relevant statutes and regulations is taken in large part from the court's previous order dated June 15, 2001 which is reported at *Sierra Club v. Atlanta Regional Commission*, 171 F.Supp.2d 1349 (N.D.Ga.2001), and the recent Fourth Circuit case of *1000 Friends of Maryland v. Browner*, 265 F.3d 216 (4th Cir.2001) which provides a thorough discussion of the pertinent provisions. The background facts are also taken from the court's order of June 15, 2001. To avoid confusion, the court will hereinafter refer to provisions of the CAA as they would be codified in the official United States Code. Hence, citations will be to U.S.C. and not U.S.C.A.

approval, and the states must revise their plans "as may be necessary to take account of [NAAQS] revisions," 42 U.S.C. § 7410(a)(2)(H)(i), or whenever the EPA determines that a SIP is "substantially inadequate to attain" the NAAQS. 42 U.S.C. § 7410(a)(2)(H)(ii).

Areas that do not meet the relevant air quality standards are known as "nonattainment areas." 42 U.S.C. § 7407(d)(1)(A)(i). As to attainment of the ozone NAAQS, the CAA establishes five levels of nonattainment classifications—marginal, moderate, serious, severe, and extreme—based upon how close the area comes to meeting the standard. See 42 U.S.C. § 7511(a)(1). The Act imposes progressively stringent requirements on areas falling within each nonattainment classification. Atlanta is classified as a serious ozone nonattainment area and was originally required to attain the ozone NAAQS no later than 1999. States with serious, severe, or extreme nonattainment areas must submit to the EPA for approval certain revisions to their SIPs, including "attainment demonstrations" which show how each nonattainment area will achieve the ozone NAAQS by the appropriate date. See 42 U.S.C. §§ 7511a(c)(2)(A), 7511a(d).

To satisfy the statutory requirements, the EPA requires attainment SIPs to contain an "inventory of current NAAQS pollutant emissions, as well as air quality modeling which demonstrates that[,] given certain assumptions about population growth, economic growth, and growth in vehicle miles traveled, the SIP's control measures will result by a certain date in a level of emissions which is in attainment with the NAAQS." Criteria for Determining Conformity, 58 Fed.Reg. 3768, 3769 (proposed Jan. 11, 1993). This level of emissions yielded after implementation of

the SIP control strategies is referred to by the EPA as an "emissions budget." Id. States with serious, severe, or extreme ozone nonattainment areas must also submit SIP revisions that show the area is making "reasonable further progress" towards reaching attainment. See 42 U.S.C. § 7511a(c)(2)(B). "The [reasonable further progress] requirements in effect create an emissions budget for each milestone year, in addition to the budget that applies for the attainment year." 58 Fed.Reg. at 3769.

The EPA requires that the emissions budgets established in attainment demonstrations and demonstrations of reasonable further progress include a quantitative motor vehicle emissions budget ("MVEB"), which establishes the "portion of the total allowable emissions defined in the submitted or approved control strategy implementation plan revision ... allocated to highway and transit vehicle use and emissions." 40 C.F.R. § 93.101. According to the EPA, "[a] SIP cannot effectively demonstrate attainment unless it identifies the level of motor vehicle emissions that can be produced while still demonstrating attainment." Approval and Promulgation of Air Quality Implementation Plans, 64 Fed. Reg. 70,397, 70,402 (proposed Dec. 16, 1999).

Given the relationship between motor vehicle emissions and ozone pollution, the CAA also includes certain "conformity" provisions that "integrate ... the [CAA] with the transportation planning process by conditioning federal approval and funding of transportation activities on their demonstrated compliance with applicable SIPs." Sierra Club v. EPA, 129 F.3d 137, 138 (D.C.Cir.1997). Pursuant to the conformity provisions, no federal "department, agency, or instrumentality" may "engage in, support in any way or provide

financial assistance for, license or permit, or approve, any activity which does not conform to an implementation plan after it has been approved." 42 U.S.C. § 7506(c)(1). An activity "conforms" to the applicable SIP only if the activity is consistent with the SIP's "purpose of eliminating or reducing the severity and number of violations of the [NAAQS] and achieving expeditious attainment of such standards," 42 U.S.C. § 7506(c)(1)(A), and if the activity will not:

(i) cause or contribute to any new violation of any standard in any area;

(ii) increase the frequency or severity of any existing violation of any standard in any area; or

(iii) delay timely attainment of any standard or any required interim emission reductions or other milestones in any area.

42 U.S.C. § 7506(c)(1)(B).[4]

Transportation plans are developed by metropolitan planning organizations ("MPOs") which are mandated by federal law for each urban area with a population of more than 50,000. *See, e.g.*, 49 U.S.C.

4. The full text of section 7506(c)(1) and (2) states:

**(c) Activities not conforming to approved or promulgated plans**

(1) No department, agency, or instrumentality of the Federal Government shall engage in, support in any way or provide financial assistance for, license or permit, or approve, any activity which does not conform to an implementation plan after it has been approved or promulgated under section 7410 of this title. No metropolitan planning organization designated under section 134 of Title 23, shall give its approval to any project, program, or plan which does not conform to an implementation plan approved or promulgated under section 7410 of this title. The assurance of conformity to such an implementation plan shall be an affirmative responsibility of the head of such department, agency, or instrumentality. Conformity to an implementation plan means-

(A) conformity to an implementation plan's purpose of eliminating or reducing the severity and number of violations of the national ambient air quality standards and achieving expeditious attainment of such standards; and

(B) that such activities will not-

(i) cause or contribute to any new violation of any standard in any area;

(ii) increase the frequency or severity of any existing violation of any standard in any area; or

(iii) delay timely attainment of any standard or any required interim emission reductions or other milestones in any area.

The determination of conformity shall be based on the most recent estimates of emissions, and such estimates shall be determined from the most recent population, employment, travel and congestion estimates as determined by the metropolitan planning organization or other agency authorized to make such estimates.

(2) Any transportation plan or program developed pursuant to Title 23 or the Urban Mass Transportation Act shall implement the transportation provisions of any applicable implementation plan approved under this chapter applicable to all or part of the area covered by such transportation plan or program. No Federal agency may approve, accept or fund any transportation plan, program or project unless such plan, program or project has been found to conform to any applicable implementation plan in effect under this chapter. In particular—

(A) no transportation plan or transportation improvement program may be adopted by a metropolitan planning organization designated under Title 23 or the Urban Mass Transportation Act, or be found to be in conformity by a metropolitan planning organization until a final determination has been made that emissions expected from implementation of such plans and programs are consistent with estimates of emissions from motor vehicles and necessary emissions reductions contained in the applicable implementation plan, and that the plan or program will conform to the requirements of paragraph (1)(B);

(B) no metropolitan planning organization or other recipient of funds under

§ 5303. The MPO "develops a long range transportation plan [or RTP] . . . which specifies the facilities, services, financing techniques, and management policies that will comprise the area's transportation system over a 20 year period." *EDF v. EPA,* 167 F.3d 641, 644 (D.C.Cir.1999). The MPO must also develop a "short-term transportation improvement program [or TIP] . . . which identifies and prioritizes the specific transportation projects to be carried out over the next three years." *Id.* at 644. An MPO may not adopt an RTP or TIP "until a final determination has been made that emissions expected from implementation of such plans and programs are consistent with estimates of emissions from motor vehicles and necessary emissions reductions contained in the applicable implementation plan," and that "the plan or program will conform to the requirements of [section 7506(c)(1)(B)]." 42 U.S.C. § 7506(c)(2)(A). The MPO in this case is defendant ARC and the RTP and TIP at issue are the 2025 RTP and the 2001–03 TIP.

As required by section 7506(c)(4), the EPA promulgated regulations establishing criteria and procedures for determining conformity (hereinafter "conformity regulations"). EPA first issued regulations for making conformity determinations in 1993. *See* 58 Fed.Reg. 62,188 (1993). It then amended those procedures in a series of rulemakings. *See* 60 Fed.Reg. 40,098 (1995); 60 Fed.Reg. 57,179 (1995); 62 Fed. Reg. 43,780 (1997). These conformity regulations provide that MVEBs contained in the attainment and reasonable further progress SIPs will be used to make the conformity determination, and the regulations set forth certain criteria against which an MVEB is measured. *See* 40 C.F.R. § 93.118(e)(4). If the EPA determines an MVEB to be adequate under the regulations, the MVEB may be relied upon by agency heads when determining whether a proposed RTP or TIP conforms to the relevant SIP, even though the SIP containing the MVEB has yet to be approved by the EPA. However, when there is no current MVEB or newly submitted SIP, the conformity regulations also contain certain requirements for transportation plans. These include the requirement that emissions measured in years with no current MVEB must be less than or equal to an MVEB for the most recent prior year or last attainment date. *See* 40 C.F.R. § 93.118.[5] The center of the dispute in this

Title 23 or the Urban Mass Transportation Act shall adopt or approve a transportation improvement program of projects until it determines that such program provides for timely implementation of transportation control measures consistent with schedules included in the applicable implementation plan.

42 U.S.C. § 7506(c)(1) and (2).

**5.** Section 93.118 of the conformity regulation states in part:

(a) The transportation plan, TIP, and project not from a conforming transportation plan and TIP must be consistent with the motor vehicle emissions budget(s) in the applicable implementation plan (or imple-

mentation plan submission). This criterion applies as described in § 93.109(c) through (g). This criterion is satisfied if it is demonstrated that emissions of the pollutants or pollutant precursors described in paragraph (c) of this section are less than or equal to the motor vehicle emissions budget(s) established in the applicable implementation plan or implementation plan submission.

(b) *Consistency with the motor vehicle emissions budget(s) must be demonstrated for each year for which the applicable (and/or submitted) implementation plan specifically establishes motor vehicle emissions budget(s), for the last year of the transportation plan's forecast period, and for any intermediate years as necessary so that the years for*

case is the interpretation and application of 42 U.S.C. § 7506(c) and the most recent promulgated regulations, *see* 62 Fed.Reg. 43,780 (1997) (codified at 40 C.F.R. §§ 93.100–93.128), in particular conformity regulation sections 93.118 and 93.106.[6]

## II. *Factual and Procedural History*

The plaintiffs allege that the defendants are seeking to advance several significant regional highway projects in the Atlanta area, despite the region's current nonat-

tainment for ozone. The plaintiffs state that in recent years the defendants employed several tactics to adopt, fund and implement the 2025 RTP and 2001–03 TIP in contravention of the conformity regulations and 42 U.S.C. § 7506(c).

As noted above, the 1990 amendments to the CAA required that the Atlanta metropolitan area attain the NAAQS for ozone by November 1999 because Atlanta is classified as a "serious" ozone non-attainment area under 42 U.S.C. § 7511(a).[7] To meet this deadline, the State of Georgia was

---

*which consistency is demonstrated are no more than ten years apart,* as follows:

 (1) Until a maintenance plan is submitted:

 (i) Emissions in each year (such as milestone years and the attainment year) for which the control strategy implementation plan revision establishes motor vehicle emissions budget(s) must be less than or equal to that year's motor vehicle emissions budget(s); and

 (ii) *Emissions in years for which no motor vehicle emissions budget(s) are specifically established must be less than or equal to the motor vehicle emissions budget(s) established for the most recent prior year. For example, emissions in years after the attainment year for which the implementation plan does not establish a budget must be less than or equal to the motor vehicle emissions budget(s) for the attainment year.*

40 C.F.R. § 93.118(a) and (b) (emphasis added).

**6.** Section 93.106(a) states in part:

 (a) Transportation plans adopted after January 1, 1997 in serious, severe, or extreme ozone nonattainment areas and in serious CO nonattainment areas. If the metropolitan planning area contains an urbanized area population greater than 200,000, the transportation plan must specifically describe the transportation system envisioned for certain future years which shall be called horizon years.

 (1) The agency or organization developing the transportation plan may choose any years to be horizon years, subject to the following restrictions:

 (i) Horizon years may be no more than 10 years apart;

 (ii) The first horizon year may be no more than 10 years from the base year used to validate the transportation demand planning model;

 (iii) If the attainment year is in the time span of the transportation plan, the attainment year must be a horizon year; and

 (iv) The last horizon year must be the last year of the transportation plan's forecast period.

 (2) For these horizon years:

 (i) The transportation plan shall quantify and document the demographic and employment factors influencing expected transportation demand, including land use forecasts, in accordance with implementation plan provisions and the consultation requirements specified by § 93.105;

 (ii) The highway and transit system shall be described in terms of the regionally significant additions or modifications to the existing transportation network which the transportation plan envisions to be operational in the horizon years. Additions and modifications to the highway network shall be sufficiently identified to indicate intersections with existing regionally significant facilities, and to determine their effect on route options between transportation analysis zones....

40 C.F.R. § 93.106(a).

**7.** The court notes that in a related action pending before this court the plaintiffs have brought suit against the EPA to compel the agency to reclassify the Atlanta area as a

required, pursuant to 42 U.S.C. § 7511a(c), to submit to EPA for approval a SIP that provided for attainment of the standard by the attainment date. In 1996, Georgia proposed to the EPA a reasonable further progress SIP (hereinafter "RFP SIP") that required a 9% reduction in NOx emissions by 1999. On March 18, 1999, EPA approved the RFP SIP. To meet the 9% reduction, the RFP SIP estimated motor vehicle emissions for NOx and required that emissions reductions would not exceed 214.77 tons per day ("tpd"). Thus, the Atlanta area was required by the approved RFP SIP to meet the reduced emission of 214.77 tpd of NOx by November 1999. It is undisputed that Atlanta has not, as of this date, met the reduced emission rate for the attainment deadline of November 1999.

The plaintiffs allege that, despite the Atlanta area's failure to meet the 1999 ozone attainment deadline, the defendants have ignored the RFP SIP mandate and have attempted to propose and fund several new highway projects not in accordance with law. The plaintiffs assert that these new highway projects will increase automobile capacity and thereby contribute to more NOx emissions in violation of the RFP SIP. The plaintiffs allege the defendants first created a "grandfather" loophole for certain highway projects that had received previous approvals to fund 61 new capacity-increasing highway projects. However, the plaintiffs state that the "grandfather" loophole was successfully challenged nationally, through a petition for review filed in the District of Columbia Circuit. The challenge resulted in a June 1999 settlement with the defendants, resulting in a deferral of 44 of these projects.

However, the plaintiffs assert that in early 2000 the defendants again sought to advance new capacity-increasing highway projects through the proposed 2025 RTP and 2001–03 TIP. On March 22, 2000, defendant ARC, as the MPO in this action, adopted the current plan, program, and conformity determination, which were submitted to the USDOT on April 4, 2000. The conformity analysis was based on an MVEB contained in a new attainment SIP submitted by the State of Georgia in October of 1999. Although EPA did not take final action on the submission, EPA found the MVEB "adequate" for conformity purposes on February 15, 2000. The proposed SIP provided a budget goal of 224 tpd of NOx to be attained by the year 2003.

The plaintiffs petitioned the Eleventh Circuit for a review of the EPA's decision (finding the new SIP adequate) as illegally extending until 2003 the mandatory 1999 RFP SIP deadline for Atlanta to meet the reduced emission level of 214.77 tpd of NOx. On July 18, 2000, the Eleventh Circuit issued a stay of the use of the revised MVEB for transportation planning purposes and enjoined federal approval of the 2025 RTP and 2001–03 TIP, which had already been approved by local and state agencies. In December 2000, the MVEB challenge was settled through an agreement between the plaintiffs, the EPA, and the State of Georgia. Pursuant to the settlement, the Eleventh Circuit remanded the EPA's decision, Georgia withdrew the MVEB, and the EPA withdrew its acceptance of the MVEB for 2003.

Because the Eleventh Circuit stayed the newly proposed SIP, the defendants were

---

"severe" nonattainment area. The case is *Sierra Club v. Whitman,* No. 1:01–CV–0127–

BBM.

required to find conformity with the MVEB in the RFP SIP. The plaintiffs argue, however, that rather than conform to the RFP SIP, the defendants approved the 2025 RTP and 2001–03 TIP on the theory that motor vehicle emissions need not comply with the 214.77 tpd MVEB in the RFP SIP until 2005. The plaintiffs allege that the defendants made this determination without proper notice or opportunity for public comment. The plaintiffs state that the newly approved date of MVEB compliance would allow the advancement and completion of all the new highway project phases despite the alleged failure of the 2025 RTP to conform to the RFP SIP at any time until 2005, and the failure of the 2001–03 TIP to ever conform to the RFP SIP within the TIP's time period.

New federal funds for the highway projects in the 2001–03 TIP became available at the beginning of the fiscal year on October 1, 2000. Prior to that date, the plaintiffs state they notified the defendant agencies that they were preparing to challenge the approvals of the 2001–03 TIP, 2025 RTP and related conformity determi-

nations. The plaintiffs allege that the defendants first sought to negotiate with the plaintiffs, but after three months broke off negotiations in January 2001 over issues of enforceability. The plaintiffs subsequently filed this action on February 13, 2001, which seeks a declaratory judgment to find that the defendants have violated numerous provisions of the CAA and the APA. In addition to declaratory relief, the plaintiffs also seek to vacate the defendants' actions to fund the 2001–03 TIP and to enjoin the advancement of the 2025 RTP and 2001–03 TIP until these plans are revised to fully conform with the RFP SIP attainment level.

On April 5, 2001, the plaintiffs moved for a preliminary injunction to enjoin the defendants from "engaging in, supporting in any way or providing financial assistance for, licensing or permitting, or approving any of these projects until further order of this Court and unless and until the violations of law set forth in the Complaint have ceased." The motion was based only on what the plaintiffs refer to as the "blatant statutory violations" alleged in Counts I, II, X and XI of the complaint.[8] On June

---

**8.** Count I alleges that the defendants approved the 2025 RTP and 2001–03 TIP in violation of the CAA's conformity requirements. Count I states in part:

The actions and decisions by defendants to adopt, submit, accept, approve, fund and assist the 2025 RTP and the 2001–03 TIP are not in accordance with law, in violation of CAA § 176(c)(1)(A), (c)(1)(B), (c)(2), and (c)(2)(A) and related regulations because the motor vehicles emissions analysis prepared by defendants fails to demonstrate that motor vehicle emissions of NOx will be reduced to 214 tpd as required by the MVEB in the applicable SIP during the first four years of the 2025 RTP and at any time during the period when the transportation projects are to be funded under the 2001–03 TIP.

The actions and decisions by the defendants to adopt, submit, accept, approve, fund and assist the 2025 RTP and the 2001–03 TIP are not in accordance with law, in violation of CAA § 176(c)(1) and (2)(A), 42 U.S.C. § 7506(c)(1) and (2)(A), and related regulations because the motor vehicle emissions estimated for at least the first five years of the 2025 RTP and for the entire life of the 2001–03 TIP do not conform to the MVEB in the applicable implementation plan.

Complaint ¶ ¶ 100–01.

Count II alleges that the defendants wrongfully approved the 2025 RTP and 2001–03 TIP in violation of conformity deadlines. Count II states in part:

The actions and decisions by defendants to adopt, submit, accept, approve, fund and assist the 2025 RTP and the 2001–03 TIP

15, 2001, the court entered an order denying the plaintiffs' motion. The court found that the plaintiffs failed to establish the required prongs of irreparable harm, the balancing of harms and the public interest. The court also found that the plaintiffs were not likely to succeed on the merits of Counts I and II, although it reserved a conclusive ruling until later in the litigation. In considering the merits of Counts I and II, the court posed two questions which it considered central to determining the likelihood of success of these claims. The first question: Is the year 2005 an appropriate first year to perform an emissions analysis to show conformity with an MVEB? [9] The second question: Does the failure to meet the 1999 attainment deadline prohibit the approval of an RTP and TIP which do not immediately conform to the applicable MVEB at the date of adoption? It is these issues which the court now seeks to resolve by way of the cross-motions for summary judgment filed by each group of parties.

The parties have filed cross-motions for partial summary judgment on Counts I, II, X and XI of the complaint. Each group of defendants has filed a motion for summary judgment, including motions submitted by ARC, the state defendants, the federal defendants and ASET. The plaintiffs have also filed a motion for summary judgment and a consolidated response to all of the defendants' motions. The court now considers the cross-motions for summary judgment.

### Summary Judgment

Summary judgment is proper "if ... there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). The moving party may provide affirmative evidence of the non-moving party's inability to prove its case at trial, and summary judgment is mandated if a party cannot establish the existence of essential elements that it carries the burden of proving at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In considering a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty*

---

are not in accordance with law, in violation of CAA § 176(c)(1)(A) and (B), 42 U.S.C. § 7506(c)(1)(A) and (B), because defendants made no lawful finding or determination that the emissions of NOx from motor vehicles in the Atlanta nonattainment area in excess of the 214 tpd NOx MVEB in the "applicable implementation plan" will meet the statutory criteria for determining conformity as required by CAA § 176(c)(1)(A) and (B) including, but not limited to, a showing that such emissions "will not delay timely attainment of any standard or required interim emissions reductions or other milestones in any area."
Complaint ¶ 103.

Counts X and XI allege that the defendants disregarded several procedural and public participation requirements of the APA and numerous federal regulations. Specifically,

Count X alleges that the USDOT approved the projects without an opportunity for public comment in violation of the APA, 5 U.S.C. § 553. *See* Complaint ¶ 238. Count XI alleges that the USDOT "unlawfully made a conformity determination" because it did not provide, among other things, public notice, complete information, a report on the disposition of comments, and the opportunity for public review and comment as required by 40 C.F.R. § 93.105; and 23 C.F.R. § 450.316(b)(1). *See* Complaint ¶¶ 241–43.

9. The court recognizes that the question would be better phrased: "Is the year 2005 an appropriate first year to perform an emissions analysis to show conformity with the MVEB in the RFP SIP?"

*Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court is mindful that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* at 255, 106 S.Ct. 2505. The plaintiff must do more, though, than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. The non-movant may not avoid summary judgment with evidence that is "merely colorable or is not significantly probative." *Raney v. Vinson Guard Serv., Inc.,* 120 F.3d 1192, 1196 (11th Cir.1997). Moreover, any factual disputes identified must be material as determined by the substantive law governing the case. *See Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115 (11th Cir.1993) ("The substantive law applicable to the case determines which facts are material.").

As noted above, the plaintiffs have moved for summary judgment on Counts I, II, X and XI. For these counts, the plaintiffs make arguments similar to those already raised in their motion for preliminary injunction, including: (1) ARC itself demonstrated that motor vehicle emissions in the 2025 RTP and 2001–03 TIP will exceed the MVEB in the RFP SIP until the year 2005; (2) the 2025 RTP and 2001–03 TIP will exacerbate and delay timely attainment of the RFP SIP deadline which was supposed to occur in 1999; and (3) regional, state and federal agencies failed to satisfy the notice and comment require-ments of the federal conformity rules, the Georgia Conformity SIP and the APA. The defendants make several arguments in response to these allegations and have filed their own motions for summary judgment on the merits of Counts I, II, X and XI. Intervenor-defendant ASET has also raised additional arguments in its motion for partial summary judgment, challenging the plaintiffs' standing to bring suit and contending that the plaintiffs are barred from contesting the conformity determinations. The court will first address ASET's arguments.

### I. *Standing and Bars to Judicial Review*

Intervenor-defendant ASET has moved for summary judgment on the basis of lack of subject matter jurisdiction. ASET contends that the court lacks subject matter jurisdiction on three grounds. First, ASET argues that the plaintiffs have not suffered a cognizable injury and thus lack Article III standing. Second, ASET argues that the plaintiffs' claims in the instant matter are barred by 23 U.S.C. § 134, because the section forbids judicial review of transportation plans which fail to consider certain planning factors. Finally, similar to its standing argument, ASET contends that the plaintiffs' suit must fail because they have not shown sufficient injury for a permanent injunction. The plaintiffs respond to ASET's first and third arguments by maintaining that they have established the case or controversy requirement and a sufficient injury through the submission of their members' affidavits. The plaintiffs respond to the second argument by noting that they are not contesting the consideration of planning factors.

The court agrees with the plaintiffs that they have standing in this case. The ini-

tial issue confronting a federal court in every case is whether the court has jurisdiction to hear the claim. *See Steel Co. v. Citizens for a Better Envmt.*, 523 U.S. 83, 94–95, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). A threshold jurisdictional issue entails the determination of whether a plaintiff has standing to bring suit. *Steel*, 523 U.S. at 102, 118 S.Ct. 1003. A "showing of standing 'is an essential and unchanging' predicate to any exercise of . . . jurisdiction." *Florida Audubon Soc'y v. Bentsen*, 94 F.3d 658 (D.C.Cir.1996) (quoting *Defenders of Wildlife*, 504 U.S. at 560, 112 S.Ct. 2130).

 The notion of standing includes both the Article III limitation on federal judicial review to "cases" and "controversies" as well as prudential considerations exercised as "part of judicial self-government." *Defenders of Wildlife*, 504 U.S. at 560, 112 S.Ct. 2130. Generally speaking, the case or controversy requirement of Article III standing requires at the least three showings: first, that the plaintiff has suffered an "injury in fact" that is (a) "concrete" and "particularized", and (b) "actual" or "imminent", not hypothetical or conjectural; second, that the injury is causally connected to the challenged action; and third, that the injury is likely to be redressed by a favorable decision. *See Steel*, 523 U.S. at 103–04, 118 S.Ct. 1003; *Defenders of Wildlife*, 504 U.S. at 560–61, 112 S.Ct. 2130. In determining the standing of an association, an association must show that its "members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in

the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (citing *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977)). The only real dispute in this case centers around the first factor of the association standing inquiry—whether an individual member would have standing.

 The court finds that the plaintiffs have alleged a sufficiently concrete, imminent injury that is traceable to the defendants' action and that can be redressed in this action. The plaintiffs and their members have an interest in preventing allegedly ill-conceived transportation projects from increasing the level of motor vehicle emissions pollution to which the members are exposed. The plaintiffs argue that the defendants made or approved a conformity determination with an emissions projection that is too high to allow Atlanta to reach attainment of the NAAQS for ozone, thus opening the door to the construction of transportation projects that will prevent Atlanta from attaining the NAAQS and subject the plaintiffs' members to continued exposure to ozone above levels determined to be safe by the EPA. Although the transportation projects will not be built by the defendants, the defendants' determination that the 2025 RTP and 2001–03 TIP were adequate was the act that was required before any transportation projects could be started. According to the plaintiffs, it is this finding that will allow the construction of transportation projects that will in turn prevent Atlanta from attaining the NAAQS for ozone. They argue that if the conformity determination were to be set aside by this court, new transportation projects could not proceed until the development of new and adequate

transportation plans, thus reducing the amount of ozone pollution to which the plaintiffs' members would be exposed. The court therefore concludes that any one of the plaintiffs' individual members would have standing to maintain an action in his own right and that the plaintiffs thus have standing to bring this action. Accordingly, ASET's motion for summary judgment on this basis is DENIED.

■ The court also agrees with the plaintiffs that 23 U.S.C. § 134(f)(2) does not operate to bar judicial review in this case.[10] This provision is not at issue in this case because the plaintiffs are not complaining about the failure of the defendants to consider any of the general planning goals of the Federal–Aid Highway Act. Rather, the plaintiffs seek to enforce regulatory and statutory deadlines imposed under the conformity provision of the CAA. Finally, the court finds ASET's arguments that the plaintiffs are not entitled to a permanent injunction because they have not shown sufficient injury equally unavailing. Accordingly, ASET's motion for summary judgment on the grounds asserted in its brief is hereby DENIED.

The court now turns to the arguments surrounding Counts I and II and the questions posed by the court in the order dated June 15, 2001. However, because the parties offer different interpretations of the statutes and regulations at issue, the court first briefly notes the standard of review and basic rules of statutory construction and regulatory interpretation.

## II. Standard of Review under the APA

Under the APA, "[t]he reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The agency's decision "is entitled to a presumption of regularity." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), *abrogated on other grounds, Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). "[T]he court must consider whether the decision was based

**10.** Section 134(f)(2) states:

> (2) **Failure to consider factors.**—The failure to consider any factor specified in paragraph (1) shall not be reviewable by any court under this title, subchapter II of chapter 5 of title 5, or chapter 7 of title 5 in any matter affecting a transportation plan, a transportation improvement plan, a project or strategy, or the certification of a planning process.

23 U.S.C. § 134(f)(2). Section 134(f)(1) states:

> (f) **Scope of planning process.—**
> (1) **In general.**—The metropolitan transportation planning process for a metropolitan area under this section shall provide for consideration of projects and strategies that will-
>> (A) support the economic vitality of the metropolitan area, especially by enabling global competitiveness, productivity, and efficiency;
>> (B) increase the safety and security of the transportation system for motorized and nonmotorized users;
>> (C) increase the accessibility and mobility options available to people and for freight;
>> (D) protect and enhance the environment, promote energy conservation, and improve quality of life;
>> (E) enhance the integration and connectivity of the transportation system, across and between modes, for people and freight;
>> (F) promote efficient system management and operation; and
>> (G) emphasize the preservation of the existing transportation system.

23 U.S.C. § 134(f)(1).

on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* at 416, 91 S.Ct. 814. While the "inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one." *Id.*

■ Because the court bases its decision on a review of the administrative record, *see* 5 U.S.C. § 706; *Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 744, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985), there are generally no genuine issues of material fact in an APA case. *See, e.g., Clairton Sportsmen's Club v. Pennsylvania Tpk. Comm'n,* 882 F.Supp. 455, 463 (W.D.Pa. 1995). As a practical matter, when a plaintiff who has no right to a trial de novo brings an action to review an administrative record which is before the reviewing court, "the case is ripe for summary disposition, for whether the order is supported by sufficient evidence, under the applicable statutory standard, or is otherwise legally assailable, involve matters of law." *Bank of Commerce of Laredo v. City Nat'l Bank of Laredo,* 484 F.2d 284, 289 (5th Cir.1973).

■ The court's review is limited to the whole administrative record before the relevant agency at the time of its decision. *See* 5 U.S.C. § 706; *Overton Park,* 401 U.S. at 420, 91 S.Ct. 814. However, a document need not literally pass before the eyes of the final agency decisionmaker to be considered part of the administrative record. *See, e.g., Clairton Sportsmen's Club,* 882 F.Supp. at 465. Pertinent information upon which administrative decisionmakers may have relied may be considered although not included in the record as filed. *See id.*

### III. *Rules of Construction*

■ In statutory construction, "the plain meaning of the statute controls un-less the language is ambiguous or leads to absurd results." *United States v. McLymont,* 45 F.3d 400, 401 (11th Cir.1995) (per curiam). Nevertheless, "this plain-meaning rule should not be applied to produce a result which is actually inconsistent with the policies underlying the statute." *Bailey v. USX Corp.,* 850 F.2d 1506, 1509 (11th Cir.1988). "A rule of law that is the product of judicial interpretation of a vague, ambiguous, or incomplete statutory provision is no less binding than a rule that is based on the plain meaning of a statute." *Golden State Transit Corp. v. City of Los Angeles,* 493 U.S. 103, 112, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989); *Rickard v. Auto Publisher, Inc.,* 735 F.2d 450, 455 (11th Cir.1984) ("One reliable indicium of the clarity of Congress' language is consistent judicial interpretation of the provision in question.").

■ In addition, the two-step process set out in *Chevron U.S.A., Inc. v. NRDC,* 467 U.S. 837, 842–45, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), guides the court in determining whether to afford deference to an agency regulation interpreting a statute the agency is charged with administering. First, the court must ask "whether Congress has directly spoken to the precise question at issue." *Id.* at 842, 104 S.Ct. 2778. If the will of Congress is clear from the statute itself, the inquiry ends—"the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. 2778. "[I]f the statute is silent or ambiguous," however, the court must next ask whether the agency's construction of the statute is reasonable. *Id.* at 843–44, 104 S.Ct. 2778. "[A] court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the adminis-

trator of an agency." *Id.* at 844, 104 S.Ct. 2778. To determine whether the statutory language is ambiguous, the court must consider "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.,* 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997).

## IV. *Appropriate Years for Emissions Analysis*

In Count I of the complaint, the plaintiffs allege that the defendants' adoption and/or approval of the 2025 RTP and 2001–03 TIP were not in accordance with law and in violation of 40 C.F.R. § 93.118 because the defendants' emissions analysis indicated that NOx levels would not fall below the requisite 214.77 tpd amount until 2005. The plaintiffs argue that this ignores the conformity regulation's express language that "[e]missions in years for which no motor vehicle emissions budget(s) are specifically established must be less than or equal to the motor vehicle emissions budget(s) established for the most recent prior year." 40 C.F.R. § 93.118(b)(1)(ii). Hence, the plaintiffs maintain that *every* year (or at least one year before 2005) for which there is no established MVEB, emissions must be equal to or below the last year for which a prior MVEB was established. Because the defendants' emissions analysis revealed that NOx levels would not meet the level of the most recent prior year with an established MVEB (the 214.77 tpd level of 1999) until the year 2005, the plaintiffs allege the defendants' adoption and/or approval of the 2025 RTP and 2001–03 TIP is not in accordance with law.

The defendants' main argument in opposition to the plaintiffs' allegation of violating conformity regulation section 93.118 is that the language stating "[e]missions in years for which no motor vehicle emissions budget(s) are specifically established" does not mean every year, but only specified emissions analysis years. These specified emissions analysis years are determined by reference to sections 93.118(b) and 93.106 which only require emissions analysis to be performed "for the last year of the transportation plan's forecast period, and for any intermediate years as necessary so that the years for which consistency is demonstrated are no more than ten years apart." 40 C.F.R. § 93.118(b). Thus, the defendants contend that conformity with the 214.77 tpd level for NOx was only required for 2005, the first year in which the defendants state an emissions analysis was mandated. In light of this dispute, the court in the order of June 15, 2001 posed the question: "Is the year 2005 an appropriate first year to perform an emissions analysis to show conformity with the MVEB in the RFP SIP?"

To answer this question in the affirmative and thus in their favor, the defendants have provided support in the regulatory text and EPA conformity regulation proposals.[11] In support of their limited interpretation that emissions analysis must only

---

11. As already noted in the facts and discussion of the statutory framework, the defendants maintain that 40 C.F.R. §§ 93.106(a) and 93.118(b) govern the selection of emissions analysis years and the applicable MVEB to the analysis year because the remaining applicable implementation plan was the RFP SIP which ended in 1999. The defendants

state the conformity determination report originally submitted to USDOT on April 4, 2000 was written to demonstrate conformity of the 2025 RTP and 2001–03 TIP with the proposed October 1999 SIP in accordance with 40 C.F.R. §§ 93.106(a) and 93.118(b). However, when the Eleventh Circuit stayed the October 1999 SIP on July 18, 2000, the

be performed in the specified years (pursuant to section 93.118(b)), the defendants rely on rulemaking proposals and previous versions of the conformity regulations. The defendants quote language from the Notice of Proposed Rulemaking dated July 9, 1996 (hereinafter "1996 NPRM") to support their contention that emissions analysis must only be performed as noted in section 93.118(b). The 1996 NPRM indicates that transportation plans need only show conformity with MVEBs for budget years established in a SIP and for the last year of the transportation plan's forecast period within ten year intervals.[12] The

October 1999 SIP could no longer serve as the "applicable implementation plan" for conformity purposes. Thus, the defendants state that the remaining applicable implementation plan was the RFP SIP which was proposed in 1996 and approved in 1999.

Because the RFP SIP did not establish an MVEB for any year within the forecast period of the 2025 RTP, the defendants state that they were only required under 40 C.F.R. § 93.118(b), to model emissions for the last year of the 2025 RTP forecast period (2025) and for intervening years no more than ten years apart (2015, 2025). Further, under 40 C.F.R. § 93.106(a), the defendants used the year 2005 to ensure that the first analysis year was no more than ten years from the base year used to validate the transportation model. The defendants state that 2005 was selected because the validation base-line year for the transportation model was 1995.

**12.** The pertinent text of the 1996 NPRM is quoted more thoroughly:

C. *For Which Years Would the Budget Test Be Demonstrated?*

This proposal would clarify (without changing the substance of) the existing transportation conformity rule's requirements regarding the years for which the budget test must be demonstrated. The proposal would explicitly require the budget test to be demonstrated for each year for which the SIP establishes a motor vehicle emissions budget.... SIPs may explicitly include motor vehicle emissions budgets for other years not specifically required to be addressed by the Clean Air Act.... In

text in the 1996 NPRM is also consistent with the language of regulation section 93.118(b), which requires conformity with "the last year of the transportation plan's forecast period, and for any intermediate years as necessary so that the years for which consistency is demonstrated are not more than ten years apart." 40 C.F.R. § 93.118(b). The defendants also rely on the 1993 version of the regulations which contains language limiting emissions analysis for "certain future years." [13]

In reply, the plaintiffs contend that the plain language of regulation section

such cases, the budget test would have to be demonstrated for the years for which a budget was specifically established. The budget test must be demonstrated for the last year of the maintenance plan and any other years for which the maintenance plan establishes motor vehicle emissions budgets.... Some maintenance plans may include specific motor vehicle emissions projections for some or all years in the timeframe of the maintenance plan, without intending that such projections operate as limitations on emissions. The budget test would not be required to be demonstrated for these years unless it was the intent of the maintenance plan to establish a budget for these years....

In addition to the years for which the SIP establishes a motor vehicle emissions budget, the budget test must be demonstrated for the last year of the transportation plan's forecast period. If there are more than ten years between the years for which the SIP specifically establishes motor vehicle emissions budgets, the budget test must also be demonstrated for some intermediate years so that the budget test is demonstrated at ten-year (or shorter) intervals.

61 Fed.Reg. 36111, 36118–36119.

**13.** The 1993 final rule states in part the following:

Today's final rule requires transportation plans and TIPs to demonstrate consistency with the SIP's motor vehicle emissions budget by performing a regional emissions analysis. This emissions analysis must include emissions from the nonattainment or

93.118(b)(1)(ii) especially when read with section 93.118(a) clearly shows that the regulations require emissions analysis to show conformity for "all future years," thereby making 2005 an inappropriate year to perform the first emissions analysis to demonstrate conformity. The plaintiffs also attempt to refute the 1993 regulatory language quoted by the defendants, *see supra* note 13, by quoting passages from the 1997 revisions of the conformity rule regulations. The 1997 language states that "SIP budgets continue to apply for conformity purposes for *all future years* until superseded by other SIP revisions." 62 Fed.Reg. 43,787 (Nov. 24, 1997) (emphasis added). Therefore, the plaintiffs contend that the current 1997 regulations disposed of the 1993 requirements of performing emissions analysis in certain future years.

The plaintiffs also contest the defendants' reliance on "horizon years" as the exclusive years for required emissions analysis. *See supra* note 6 (quoting 40 C.F.R. § 93.106). The plaintiffs contend that nowhere in section 93.118 does the term "horizon years" appear and the use of the term in section 93.106 "says nothing about the years for which emissions analyses may or must be performed." Moreover, the plaintiffs point to section 93.118(d)(2), which contains language that states that emissions analysis may be performed "for any years in the timeframe of the transportation plan." Therefore, the plaintiffs argue that the regulations clearly permit emissions analysis to be performed in years other than those proposed by the defendants.

Finally, the plaintiffs contend that the conformity regulations must be read in conjunction with the language of 42 U.S.C. § 7506(c)(1)(B)(iii) which prohibits transportation plans from "delay[ing] timely attainment." The plaintiffs make several arguments in this regard, including: (1) the conformity regulations must be read with the statutory purpose of section 7506(c); (2) agencies have a duty to satisfy both the conformity regulations and the statutory criteria; and (3) case law interpreting CAA deadlines mandates that the statutory deadlines must be strictly enforced. These arguments are considered in the discussion of Count II and the second question posed by the court. *See* Part V.

In response, the defendants dismiss the plaintiffs' argument that the 1997 rule revisions eliminated the requirement that emissions analysis be performed only in certain future years. The defendants state that the full text of the rule quoted by the plaintiffs, taken in context, clearly indicates that the 1997 revision also kept the 1993 conformity rule concerning emissions analysis. The defendants point to the sentence directly preceding the plaintiffs' quotation: *"This final rule retains the November 1993 conformity rule's requirements.* Conformity must continue to be demonstrated over a 20–year timeframe, and SIP budgets continue to apply for conformity purposes for all future

---

maintenance area's entire existing transportation network (as described in the rule), in addition to all proposed regionally significant Federal and non-federal highway and transit projects. *The regional emissions analysis must estimate total projected emissions for certain future years (including the attainment year),* and may include the ef-

fects of any emission control programs which are already adopted by the enforcing jurisdiction (such as vehicle inspection and maintenance programs and reformulated gasoline and diesel fuel).

Final Rule, 58 Fed.Reg. 62195 (Nov. 24, 1993) (emphasis added).

years until superseded by other SIP revisions." 62 Fed.Reg. 43,787 (emphasis added). Thus, the current version of the rule adopts the 1993 version's acceptance of performing emissions analysis only in certain years. The defendants also note that although an emissions analysis "may be performed for any years in the timeframe of the transportation plan" under section 93.118(d)(2), this requirement is entirely optional. On the other hand, it is mandatory that an emissions analysis must be performed "not more than ten years apart and [must be] performed for the attainment year ... and the last year of the plan's forecast period." 40 C.F.R. § 93.118(d)(2).

 After considering the arguments of the opposing parties, the court finds that it must answer the first question in the affirmative and enter judgment in favor of the defendants for Count I. The parties essentially offer differing interpretations of conformity regulation section 93.118(b)(1)(ii). The defendants narrowly construe the "emissions in years" phrase to mean only the emissions analysis years specified in subsection (b), while the plaintiffs contend that "emissions in years" broadly refers to other years in which an emissions analysis is not required by the regulations.

Although the language of section 93.118 is undoubtedly muddled, the court agrees with the defendants' interpretation as the most reasonable, using a consistent meaning for language throughout the regulations, and based on the promulgation history of the regulations and the regulations as a whole. Throughout the conformity regulations there are numerous references to analysis years. Each of these references is consistent with section 93.118(b) which requires conformity with emissions

analysis years "for the last year of the transportation plan's forecast period, and for any intermediate years as necessary ... no more than ten years apart." 40 C.F.R. § 93.118(b). For example, the subsection directly preceding section 93.118(b)(1)(ii) begins "[e]missions in each year (such as milestone years and the attainment year)." 40 C.F.R. § 93.118(b)(1)(i); *see also id.* § 93.106(a)(1); § 93.119(d)(6)(e). The parenthetical directly after "[e]missions in each year" suggests that "each year" only refers to certain emissions analysis years and not every year. Hence, language within the same regulation section demonstrates that "emissions in years" means only required emissions analysis years. Moreover, there are other regulation sections with similar language stating that emissions analysis must be performed "for the last year of the transportation plan's forecast period, and for any intermediate years as necessary ... no more than ten years apart." *See, e.g.,* 40 C.F.R. §§ 93.106(a); 93.118(d)(2); 93.119(e). Finally, the plaintiffs have presented no other section within the regulations that is similar to their interpretation of section 93.118(b)(1)(ii). Therefore, although the court finds the simplicity of the plaintiffs' interpretation appealing, it is not, in the court's view, grounded in a realistic interpretation of the conformity regulations as a whole.

In conclusion, the court agrees with the defendants that section 93.118(b)(1)(ii) refers only to emissions analysis years which are specified in sections 93.118(b) and 93.106. Therefore, the court cannot conclude that the defendants' actions in adopting and/or approving the 2025 RTP and 2001–03 TIP were not in accordance with law. Accordingly, the motions for summary judgment on Count I filed by the

ARC, state and federal defendants are hereby GRANTED and the plaintiffs' motion for summary judgment on Count I is hereby DENIED.

## V. *Effect of Failure to Meet Attainment Deadline*

For Count II, the parties dispute what the consequences of the failure to meet the 1999 attainment deadline has on the adoption and approval of new transportation projects. The plaintiffs argue that the failure to meet the 1999 attainment deadline precludes the defendants from adopting an RTP and TIP which do not conform to the 1999 MVEB at the date of adoption because it violates the express provisions of section 7506(c) by "delay[ing] timely attainment." The defendants contend that the failure to meet the attainment deadline does not impose the sanction of construction bans or funding limitations on future RTPs and TIPs and does not require an MPO or other agency to find conformity of a proposed RTP and TIP at the date of adoption. For this dispute, the court posed question two: "Does the failure to meet the 1999 attainment deadline prohibit the approval of an RTP and TIP which do not immediately conform to the applicable MVEB at the date of adoption?"

The plaintiffs essentially make arguments similar to those made in connection with Count I. That is, they argue that section 7506(c)(1)(B)(iii), which prohibits agencies from "delay[ing] timely attainment," clearly mandates that attainment deadlines must be met as a condition for demonstrating the conformity of any federally approved or funded activity. Thus, even if the defendants fully complied with the conformity regulations, the failure to meet the attainment deadline in 1999 imposes a duty (through section 7506(c)(1) and (2)) on the defendants to attain the 214.77 tpd level as quickly as possible by proposing and approving transportation plans which meet the attainment levels at the date of adoption.

The defendants respond to these arguments on three grounds. First, the defendants contend that the purpose of conformity determinations is to gauge only the future impact of a transportation plan on air quality after the plan is approved and funded and not to assess past performance. In support, the defendants again cite the 1996 NPRM which states that "conformity is not intended to be assessed retrospectively." [14]

Second, the defendants contend that the penalty for the failure to achieve an at-

---

14. The passage is highlighted in the text:
 *G. Budget Test*
 This proposal would combine existing §§ 51.428–51.432 (§§ 93.118–93.120) into one streamlined section that describes the budget test for the transportation plan, TIP, and project not from a conforming plan and TIP. As described in section III. of this preamble, the implementation of the budget test and the years for which budgets apply would be clarified.
 *H. Emission Reduction Tests*
 This proposal would combine existing §§ 51.436–51.446 (§§ 93.122–93.127), which describe the tests for emission reductions in the interim period for ozone, CO, PM sub10, and NO sub2 areas, into one streamlined section that addresses all pollutants and the transportation plan, TIP, and project not from a conforming plan and TIP. This would avoid the repetition of the definitions of the "Baseline" and "Action" scenarios and improve the readability of the transportation conformity rule. *This proposal would provide that the first analysis year shall be no more than five years beyond the year in which the conformity determination is being made. The existing conformity rule requires the first analysis year to be 1995 in CO nonattainment areas and 1996 in ozone nonattainment areas. This requirement is obviously no longer appropriate, because conformity is not intended to be assessed retrospectively.*

tainment deadline does not compel a transportation plan to conform at the date of adoption. The defendants note that the legislative history of the Act indicates the CAA would not "impose construction bans or highway funding limitations," *see* S. REP. No. 101–228 at 47, *reprinted in* 1990 U.S.C.C.A.N. 3385, 3433, when a nonattainment area fails to meet the attainment deadline.[15] The defendants argue that highway construction bans are imposed under the CAA only in very limited circumstances under 42 U.S.C. § 7509(a) and will not be imposed against nonattainment areas less than "severe" under 42 U.S.C. § 7511(b)(4). The sanction of a construction ban is only used in circumstances such as: (1) when states fail to submit a SIP; (2) when the EPA disapproves a submitted SIP; (3) when the EPA finds that an approved SIP is not being implemented; and (4) when a severe nonattainment area fails to meet an attainment date.[16] *See* 42 U.S.C. §§ 7509(a), (b); 7511(b)(4). The defendants contend that none of these violations are at issue in this case. The defendants state that the failure to meet the 1999 attainment deadline only forces a state to revise its SIP or reclassify the offending nonattainment area to a higher attainment status such as severe. *See* 42 U.S.C. § 7509(a), (d).

Finally, the defendants contest the plaintiffs' broad statutory interpretation of section 7506(c)(1)(B)(iii). The defendants challenge the plaintiffs' theory that the conformity regulations must be read with the statute or that agencies have a duty to independently satisfy the mandate of section 7506(c)(1)(B)(iii). The defendants note that section 7506(c)(4)(A) gives an express delegation of authority to the EPA to develop criteria and procedures for MPOs and federal agencies to follow in making conformity determinations. Hence, MPOs, state and federal agencies do satisfy the general mandate of section 7506(c)(1)(B)(iii) by following the promulgated conformity regulations.

■■■ Here, as in the discussion of Count I, the parties have raised numerous arguments over the interpretation and the effect of section 7506(c)(2)(B)(iii) and the conformity regulations. While this court certainly shares the dismay of the plaintiffs that the 1999 goal for 214.77 tpd of NOx emissions has not been met, the court is not persuaded that the relief sought by plaintiffs is provided for by the statute sections upon which they rely. As stated above, section 7506(c)(4) mandated that EPA promulgate regulations which estab-

61 Fed.Reg. 36130 (emphasis added).

**15.** A more complete text of the Senate Report states in part:

The bill does not impose construction bans or highway funding limitations for areas that fail to attain the standard. The bill is designed to induce areas to implement all available measures during the period prior to the attainment deadline. If an area does not attain the air quality standard by the deadline, it is required to adopt controls and measures applicable to the next higher ozone classification, and in serious, severe and extreme areas, major stationary sources of VOCs are required to pay a fee of $5,000 per ton emitted in excess of 50 per-

cent of the amount actually emitted in the year the standard was to have been attained. This is an incentive for these sources to reduce the VOCs further; if a source cuts emissions in half, it will no longer be required to pay the $5,000 per ton fee.

S. REP. No. 101–228 at 47, *reprinted in* 1990 U.S.C.C.A.N. 3385, 3433.

**16.** There is no dispute that the 1999 attainment date was not met. However, the Atlanta metropolitan area is currently classified as a "serious" ozone non-attainment area, which is a level below "severe" in gradations of non-attainment.

lish criteria and procedures for establishing conformity. As the court has already found, the defendants have complied with these conformity regulations. Nevertheless, the plaintiffs assert that section 7506(c) imposes an additional affirmative duty to find conformity upon the date of adoption. In the court's view, this argument fails because (1) it is in essence a challenge to the conformity regulations for not adequately satisfying the statutory mandate; and (2) the interpretation that section 7506(c)(1)(B)(iii) operates to bar approvals of transportation plans where an attainment date has already passed and no new SIP has been approved is at odds with other provisions in the CAA.

First, section 7506(c)(4) expressly permits the EPA to promulgate regulations to achieve this goal. *See* 42 U.S.C. § 7506(c)(4). Hence, the conformity regulations can be seen as guidelines to effectuate the statutory mandate.[17] As the parties acknowledge, this court is not the appropriate court to entertain a petition for review of the adequacy of the regulations. This court may not judicially alter the regulations to fulfill a statutory imperative when the regulations have already been promulgated and reviewed by the proper agencies and courts and found to adequately fulfill this statutory mandate.

Second, although the language of section 7506(c)(1)(B)(iii) precludes the approval of any transportation plan that would "delay timely attainment" even after the attainment deadline has passed, this court must determine the consequence of failing to meet the attainment deadline that has passed. In the court's view, the statute does not provide that the consequence of failing to meet an attainment deadline necessarily compels conformity of transportation plans at the date of adoption. The penalty for failing to meet an attainment deadline for ozone is expressly delineated in section 7511 of the CAA. Specifically, section 7511(b)(2)(A) states that "[w]ithin 6 months following the applicable attainment date ... for an ozone nonattainment area, the Administrator shall determine ... whether the area attained the standard by that date.... [A]ny area that the Administrator finds has not attained the standard by that date shall be reclassified by operation of law." Noticeably, the section does not mandate that new transportation plans are required to conform at the date of adoption. Moreover, section 7506 does not state what the effect of a missed attainment deadline has on conformity determinations. Based upon an exhaustive review of the remedies provided for by the statute, the court cannot conclude that the failure to meet an attainment deadline compels an MPO or a federal agency to find conformity of a transportation plan

---

**17.** It is true that a court does "not start from the premise that [the statutory] language is imprecise. Instead, [the court must] assume that in drafting legislation, Congress said what it meant." *United States v. LaBonte,* 520 U.S. 751, 757, 117 S.Ct. 1673, 137 L.Ed.2d 1001 (1997). Further, it is only after the court has determined that words used by Congress are ambiguous, or that Congress left a gap in the statutory language, that the court should turn to the agency's interpretation of these words to ascertain whether it deserves any deference. *See K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 291, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988) ("The traditional deference courts pay to agency interpretation is not to be applied to alter the clearly expressed intent of Congress."). Courts must give "the words used their ordinary meaning." *Legal Envtl. Assistance Found., Inc. v. U.S. EPA,* 118 F.3d 1467, 1474 (11th Cir.1997). However, in this case the court is not reviewing the regulations to determine whether they effectuate the statutory mandate to not "delay timely attainment," but rather the court is asked to determine whether the agencies assigned to apply the regulations have followed the regulations already promulgated.

immediately upon the date of the plan's adoption.

Moreover, the cases cited by the plaintiffs for the proposition that CAA deadlines must be strictly enforced are inapposite to the present case. *See, e.g., Union Elec. Co. v. EPA,* 427 U.S. 246, 96 S.Ct. 2518, 49 L.Ed.2d 474 (1976); *Sierra Club v. EPA,* 129 F.3d 137 (D.C.Cir.1997); *NRDC v. EPA,* 22 F.3d 1125 (D.C.Cir. 1994); *Delaney v. EPA,* 898 F.2d 687 (9th Cir.1990); *Abramowitz v. U.S. EPA,* 832 F.2d 1071 (9th Cir.1987); *NRDC v. EPA,* 475 F.2d 968 (D.C.Cir.1973). These cases involve challenges to actions by EPA in granting extensions to statutory deadlines. Here, however, the issue before the court is not whether Congress intended for strict deadlines, but what specific duties and responsibilities those deadlines create for the defendants. Further, the cases cited by the plaintiffs in support of their position that regulations "must be interpreted so as to harmonize with the statute it implements" are cases involving petitions for review in the Court of Appeals or appeals from agency decisions to challenge the regulations themselves. *See Joy Tech., Inc. v. Secretary of Labor,* 99 F.3d 991 (10th Cir.1996); *Secretary of Labor, Mine Safety and Health Admin. v. Western Fuels–Utah, Inc.,* 900 F.2d 318 (D.C.Cir. 1990); *Emery Min. Corp. v. Secretary of Labor,* 744 F.2d 1411 (10th Cir.1984). Here, in contrast, this court is being asked to review whether the defendants acted in accordance with the statute and the underlying conformity regulations which are not being challenged.

The court agrees with the plaintiffs that the statutory mandate prohibiting the delay of timely attainment is an important expression of the intent of Congress. However the court cannot agree with the plaintiffs that this admirable intent carries with it the remedy which they seek. Plaintiffs ask this court to stop all further action on the 2025 RTP and the 2001–03 TIP until they are revised to meet the 1999 goal for no more than 214.77 tpd of NOx emissions.[18] After an exhaustive (and exhausting) review of this complex statutory scheme, the court is persuaded that plaintiffs are urging this court to impose this drastic remedy based upon a selective reading of a statute that was intended to give states more flexibility in meeting emissions goals. Accordingly, because the court concludes that the defendants' actions were not contrary to law, the motions for summary judgment on Count II of the complaint filed by the ARC, state and federal defendants are hereby GRANTED and the plaintiffs' motion for summary judgment on Count II is hereby DENIED.

## VI. *Adequate Notice and Opportunities for Public Comment*

The plaintiffs contend in Counts X and XI that the USDOT violated public involvement requirements and procedure. First, the plaintiffs allege that the USDOT violated 5 U.S.C. § 553[19] when it did not provide notice and opportunities for public comment on the use of the 2005 analysis year to show conformity. Second, the

---

**18.** The court notes that plaintiffs have not provided any evidence to this court that simply freezing road planning and construction where they are now will further the intent of Congress not to delay timely attainment.

**19.** Section 553 states:

(a) This section applies, according to the provisions thereof, except to the extent that there is involved-
 (1) a military or foreign affairs function of the United States; or
 (2) a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts.

plaintiffs state that the USDOT violated 40 C.F.R. § 93.105(e) and 23 C.F.R. § 450.316(b)(1) [20] by approving the conformity determination made by ARC using the 2005 emissions analysis year with inadequate public involvement.

The defendants respond to the plaintiffs' claims on essentially two grounds. First, the defendants contend that the conformity determination made by the USDOT was not a rule subject to the notice and comment procedures of 5 U.S.C. § 553. Second, the defendants state that USDOT was not required to provide for public access and comment before approval of the conformity determination because the Inter-

(b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include—
(1) a statement of the time, place, and nature of public rule making proceedings;
(2) reference to the legal authority under which the rule is proposed; and
(3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.
Except when notice or hearing is required by statute, this subsection does not apply—
(A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice; or
(B) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.
(c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose. When rules are required by statute to be made on the record after opportunity for an agency hearing, sections 556 and 557 of this title apply instead of this subsection....

**20.** 40 C.F.R. § 93.105(e) states the following in part:
(e) Public consultation procedures. Affected agencies making conformity determinations on transportation plans, programs, and projects shall establish a proactive public involvement process which provides op-

portunity for public review and comment by, at a minimum, providing reasonable public access to technical and policy information considered by the agency at the beginning of the public comment period and prior to taking formal action on a conformity determination for all transportation plans and TIPs, consistent with these requirements and those of 23 C.F.R. § 450.316(b)....
*Id.* Similarly, 23 C.F.R. § 450.316(b)(1) states in part:
(b) In addition, the metropolitan transportation planning process shall:
(1) Include a proactive public involvement process that provides complete information, timely public notice, full public access to key decisions, and supports early and continuing involvement of the public in developing plans and TIPs and meets the requirements and criteria specified as follows:
. . . .
(vii) When significant written and oral comments are received on the draft transportation plan or TIP (including the financial plan) as a result of the public involvement process or the interagency consultation process required under the U.S. EPA's conformity regulations, a summary, analysis, and report on the disposition of comments shall be made part of the final plan and TIP;
(viii) If the final transportation plan or TIP differs significantly from the one which was made available for public comment by the MPO and raises new material issues which interested parties could not reasonably have foreseen from the public involvement efforts, an additional opportunity for public comment on the revised plan or TIP shall be made available;
*Id.*

agency Transportation Conformity Memorandum of Agreement ("MOA") signed by ARC, Georgia Department of Transportation and the Federal Highway Administration, designates ARC as the "public consultation mechanism both for transportation planning and for conformity determinations." MOA § 106(k). The memorandum further states that ARC "[p]rovides opportunity for public review and comment and responds in writing to all public comments." *Id.* § 106(f)(5). The defendants contend that the administrative record "is replete with the complete public involvement process conducted by ARC under the requirement of section 106(k) and the applicable federal regulations." Specifically, ARC notes that in at least one formal public hearing and in numerous official public meetings, the public was provided information regarding the use of the RFP SIP and the 214.77 tpd budget. ARC states that the presentations pointed out that the possibility existed that the 224 tpd budget from the October 1999 SIP would not be approved by the EPA and, if it was not approved, then the 214.77 tpd budget from the RFP SIP, with an analysis year of 2005, would be relied upon. In support of this argument, the defendants have submitted affidavits of ARC officers Joel Stone, Harry West and John Orr, who were present at the public meetings and state that they discussed the possible use of the 2005 analysis year. *See* Affs. of Stone, West and Orr, ARC Exhibits 3–5. Thus, the defendants state that they fully complied with the public comment requirements.

The plaintiffs reply that the alleged "notice" of using the RFP SIP budget and the 2005 emissions analysis year was wholly inadequate. The plaintiffs state that the only notice of the possible use of the 2005 analysis year were two slides that the defendants quickly flashed on the screen and which contained fine print that was impossible to read. The plaintiffs argue that the slides provided no notice or an opportunity to comment on the agencies' "construction of the applicable statutory and regulatory provisions governing demonstrations of conformity with MVEBs for prior years, and certainly provided no suggestion that the agencies would construe these provisions not to require that emissions meet the MVEB prior to 2005." The plaintiffs also contend that they submitted a letter questioning the use of the original 1999 proposed MVEB (which was later withdrawn) on March 21, 2000, but received no response by ARC or USDOT.

■ First, the court agrees with the defendants that the conformity determination of the USDOT was not a rule for the purposes of section 553. The APA establishes procedures governing the conduct of administrative agencies. The structural approach of the APA is to divide all the world of administrative action into two categories; an agency either issues an "order" by "adjudication" or a "rule" by "rulemaking." *Jean v. Nelson,* 711 F.2d 1455, 1475 (11th Cir.1983). The APA defines a "rule," in relevant part, as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." 5 U.S.C. § 551(4). Although the APA generally prohibits an agency from issuing a rule without public notice and comment, it does not subject every rule to its requirements. Instead, an agency may develop "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice" without providing public notice and comment. *Id.* § 553(b)(3)(A).

However, "the fact that an agency need not employ rulemaking in order to exercise its discretion on a case-by-case basis does not mean it cannot or has not resorted to a rule of general applicability which limits its discretionary function." *Jean,* 711 F.2d at 1475. In the event a rule is "resorted to," rulemaking is required. 5 U.S.C. § 553. An administrator vested with discretionary authority to act on a case-by-case basis may exercise that discretion by promulgating rules of general applicability. If the administrator does announce a general rule, however, rulemaking procedures must be followed. *See* 5 U.S.C. § 553(b) and (c).

In *Jean,* the Eleventh Circuit considered the question of whether an agency-wide change in policy by the Immigration and Naturalization Service ("INS") regarding the incarceration of Haitian refugees constituted a rule. The court found that an announcement by the INS that it would "universally enforce a detention policy while limiting parole [was] an agency statement of general applicability and future effect designed to implement, interpret, or prescribe law or policy, in other words a rule." *Id.* at 1475 (internal quotation marks omitted). On the other hand, the court also stated that a decision to grant or withhold parole in an individual case was within the discretion of the INS, and would not require notice and comment procedures. *See id.* at 1475–76. Here, individual conformity determinations or approvals of an MPO's RTP or TIP by the federal defendants could not be considered a "rule" within the meaning of section 553 and case law. The decisions made by the federal defendants in this case were made within their sphere of discretion and were based on promulgated rules which have already been subject to the formal rule making process.

Further, even assuming a conformity determination or approval of transportation plans could be considered a "rule" within the definition in the APA, the determination would fall within the grant exemption of section 553(a)(2). The rulemaking section of the APA excludes any "matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts" from the APA's requirements. 5 U.S.C. § 553(a)(2). Although this group of exceptions is extremely broad, "they are applicable only when one of the expected subjects is clearly and directly involved in the agency action. If a clear and direct relationship does not exist, compliance with the APA's rulemaking procedures is required." STEIN, MITCHELL & MEZINES, ADMINISTRATIVE LAW § 1502[4][a]. "The exception for public grants includes all federally supported 'subsidy programs' and 'grants-in-aid programs under which the federal government makes payment to state and local governments' as well as private individuals and entities." *Id.* § 1502[4][e] (quoting ATTORNEY GENERAL'S MANUAL ON THE APA 27–28 (1947)). "The grant exception has been validly asserted under various programs, including ... the implementation of aid for federally assisted highways...." *Id.* (citing *National Wildlife Federation v. Snow,* 561 F.2d 227, 232 (D.C.Cir.1976) (hereinafter "*Snow*")).

In *Snow,* the court found that the grant exemption in section 553(a)(2) applied to regulations promulgated by the Federal Highway Administration dealing with the approval process for federal highway funds and federal funds for right-of-way acquisitions. The court stated:

Clearly Congress meant to confine the (a)(2) exemption to its express terms, to prevent its use as an all purpose escape

clause. But there can be no doubt that the regulations challenged in this case are both clearly and directly related to a federal grant program. One changes the approval process necessary to maintain state highway department eligibility for federal funds; the other allows federal funds to be used for right-of-way acquisitions before the normal location and design approvals have been given. These regulatory decisions go beyond mere managerial mechanics. They directly affect the general public's hearing and participation rights in the administration of the federal grant-in-aid program. However, there is a clear and direct connection with an exempted "proprietary" subject, and this excuses the FHWA from an overall statutory obligation to comply with notice and comment procedures in promulgating the challenged regulations.

*Snow,* 561 F.2d at 232 (footnotes omitted).

Here, although the plaintiffs maintain that the conformity determination is a distinct finding of the USDOT that is not "clearly and directly involved" in federal highway grants, federal funds for highway projects in the instant case necessarily depend on the required conformity determination of transportation plans. Further, the regulations which the plaintiffs rely on for Count XI contemplate public involvement procedures for conformity determinations and transportation plan approval. Hence, the USDOT is already subject to numerous notice and comment procedures concerning conformity determinations. Finally, the plaintiffs simply have not offered any persuasive authority or even any other instance where the USDOT has been required to engage in the rulemaking process for conformity determinations of transportation plans. For these reasons,

the court cannot conclude that the USDOT is subject to the requirements of 5 U.S.C. § 553. Accordingly, the motions for summary judgment on Count X of the complaint filed by the ARC, state and federal defendants are hereby GRANTED and the plaintiffs' motion for summary judgment on Count X is hereby DENIED.

 The court also agrees with the defendants that the USDOT adequately complied with the public involvement regulations of 40 C.F.R. § 93.105(e) and 23 C.F.R. § 450.316(b)(1). Arguably, the USDOT fulfilled its obligation under the regulations when it signed the MOA and designated ARC as the "public consultation mechanism both for transportation planning and for conformity determinations." Hence, USDOT was not itself required to engage in public involvement procedures. In any event, as noted in the Administrative Record and the MOA, there were opportunities for public involvement throughout the conformity determination process and the court finds that the USDOT complied with the regulations regarding the MVEB in the RFP SIP. The defendants have submitted uncontested affidavits that the public was notified at six separate times and in six separate locations that the MVEB in the RFP SIP and the 2005 analysis year could possibly be used in the conformity determination. *See* Affs. of Stone, West and Orr, ARC Exhibits 3–5. Although the plaintiffs contend that these presentations were insufficient to provide adequate notice, the court cannot conclude that the regulations require more than that already provided by the defendants. Further, the plaintiffs' contention that they did not receive sufficient opportunities for comment because their letter submitted to the ARC and USDOT was not answered is unpersuasive. It is

undisputed that this letter was submitted after the thirty day comment period. Under the applicable regulations, ARC was only required to respond to those submitted within the designated comment period. *See* 23 C.F.R. § 450.316(b)(1)(iv). Therefore, the court concludes that the USDOT's conformity determination was not defective because of improper public involvement procedures. Accordingly, the motions for summary judgment on Count XI of the complaint filed by the ARC, state and federal defendants are hereby GRANTED and the plaintiffs' motion for summary judgment on Count XI is hereby DENIED.

### Summary

The plaintiffs' motion for partial summary judgment [Doc. No. 65–1] is DENIED. The motion for partial summary judgment filed by defendant-intervenor Advocates for Safe and Efficient Transportation [Doc. No. 67–1] is DENIED. The motion for partial summary judgment filed by defendants Norman Mineta, Vince Schimmoller, Jenna L. Dorn, Larry Dreihaup, and Jerry Franklin [Doc. No. 68–1] is GRANTED. The motion for partial summary judgment filed by defendants Atlanta Regional Commission and Charles Krautler [Doc. No. 69–1] is GRANTED. The motion for partial summary judgment filed by defendants Georgia Department of Transportation, Georgia State Transportation Board, Tom Coleman, Tom Triplett, W.P. Langdale, Sam M. Wellborn, Brad Hubbert, Emory C. McClinton, Johnny Gresham, Boyd Pettit, Harold Dixon, William G. Hasty, Sr., James L. Lester, and Steve Reynolds [Doc. No. 70–1] is GRANTED. Counts I, II, X and XI of the complaint are hereby DISMISSED.